IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Snyder Brothers, Inc.,     :
               Petitioner     :
                               :    No. 1043 C.D. 2015
           v.               :
                               :
Pennsylvania Public Utility      :
Commission,                  :
             Respondent    :
                               :
                               :
Pennsylvania Independent Oil & Gas   :
Association,                 :
            Petitioner     :
                               :    No. 1175 C.D. 2015
           v.               :
                               :    Argued: February 8, 2017
Pennsylvania Public Utility      :
Commission,                  :
            Respondent    :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                  HONORABLE ROBERT SIMPSON, Judge
                  HONORABLE P. KEVIN BROBSON, Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE JULIA K. HEARTHWAY, Judge
                  HONORABLE JOSEPH M. COSGROVE, Judge

OPINION BY
JUDGE McCULLOUGH                               FILED: March 29, 2017

         Snyder Brothers Inc. (SBI) and intervenor Pennsylvania Independent Oil & Gas Association (PIOGA) (collectively, Petitioners) petition for review of the June 11, 2015 order of the Pennsylvania Public Utility Commission (Commission) denying

their exceptions in part, granting them in part, and adopting as modified the initial decision and order of an administrative law judge (ALJ).[1]  After careful review, we reverse.

**Background**

The decisive question presented on appeal is one of statutory interpretation and involves the definition of a "stripper well" in Act 13,[2] which unlike a "vertical gas well,"[3] does not have to pay impact fees.  *See* Section 2302(f) of Act 13, 58 Pa.C.S. §2302(f).   In pertinent part, a "stripper well" is denoted as an "unconventional gas well incapable of producing more than 90,000 cubic feet [cf] of gas per day during **any** calendar month . . . ."  Section 2301 of Act 13, 58 Pa.C.S. §2301 (emphasis supplied).   We are asked to determine whether the General Assembly intended the word "any" to mean "one" or "every."

The essential facts are not in dispute.  The Bureau of Investigation and Enforcement (I&E) filed a complaint on January 17, 2014, alleging that SBI did not identify and pay impact fees on 24 wells in 2011 and 21 wells in 2012.  In its answer and new matter, SBI claimed that the wells were stripper wells, not vertical wells, and thus subject to impact fees.  SBI also noted that Act 13 does not contain a mechanism

---

[1] By order dated August 3, 2015, this Court consolidated the separate appeals filed by SBI and PIOGA.

[2] 58 Pa.C.S. §§2301—3504.

[3] A "Vertical gas well" is defined as an "unconventional gas well which utilizes hydraulic fracture treatment through a single vertical well bore and produces natural gas in quantities greater than that of a stripper well."  Section 2301 of Act 13, 58 Pa. C.S. §2301.

allowing it to pay the challenged fees under protest or to receive a refund if it is later determined that they had been paid erroneously. (Commission's decision at 2-3.)

Thereafter, SBI moved for summary judgment, arguing that a "stripper well" in Act 13 unambiguously refers to a well that produces *less than* 90,000 cf of gas per day in one month, or *any single month*, during the twelve-month reporting period. SBI also asserted, in the alternative, that the impact fees were a tax and that the term "any" in stripper well must be strictly construed in its favor as the taxpayer pursuant to section 1928(b)(3) the Statutory Construction Act of 1972 (SCA),[4] 1 Pa.C.S. §1928(b)(3) (stating that "provisions imposing taxes" shall be strictly construed). I&E countered that the word "any" made the definition of stripper well ambiguous because it could mean either "one or another taken at random" or "every," and noted that it had received numerous inquiries from natural gas producers about how to determine which wells qualified as stripper wells. (Commission's decision at 10-13.)

The ALJ agreed with I&E that the definition of "stripper well" was ambiguous, citing four prior orders of the Commission.[5] The ALJ noted that the Commission suggested in prior <u>Reconsideration</u> and <u>Proposed Rulemaking Orders</u>

_____

[4] 1 Pa.C.S. §§1501—1991.

[5] Act 13 of 2012 – Implementation of Unconventional Gas Well Impact Fee Act, Implementation Order Regarding Chapter 23, Docket No. M-2012-2288561, entered May 10, 2012 (<u>Implementation Order</u>); Act 13 of 2012 – Implementation of Unconventional Gas Well Impact Fee Act, Reconsideration Order Regarding Chapter 23, Docket No. M-2012-2288561, entered July 19, 2012 (<u>Reconsideration Order</u>); Act 13 of 2012 – Implementation of Unconventional Gas Well Impact Fee Act, Docket No. M-2012-2288561, entered December 20, 2012 (<u>Clarification Order</u>); Act 13 of 2012 – Implementation of Unconventional Gas Well Impact Fee Act, Proposed Rulemaking Order, Docket No. L-2013-2375551, entered October 17, 2013 (<u>Proposed Rulemaking Order</u>).

that a vertical gas well was subject to the impact fee if it produced *more than* 90,000 cf of gas per day in *any* calendar month in a calendar year. The ALJ also found that the impact fee was not a tax because it does not raise revenue for the general funds of either the Commonwealth or the municipalities, but the revenue is distributed to affected municipalities to offset the impact of drilling. Concluding that SBI was not entitled to summary judgment, and that I&E's interpretation of "stripper well" was consistent with the Commission's previous interpretations of "vertical gas well," the ALJ scheduled a hearing on the calculation of the fees, charges, and penalties sought by I&E. (Commission's decision at 13-15.)

In its recommended decision, the ALJ found that SBI did not challenge the accuracy of I&E's calculations of the amount of outstanding impact and administrative fees. On this basis, the ALJ awarded: (1) interest under section 2308(a) of Act 13, 58 Pa.C.S. §2308(a),[6] and accepted I&E's proposed 3% interest rate as reasonable; (2) a mandatory penalty under section 2308(b) of Act 13, 58 Pa.C.S. §2308(b),[7] at the 25% maximum rate; and (3) a discretionary civil penalty in the amount of $50,000.00 under section 2310(a) of Act 13, 58 Pa.C.S. §2310(a).[8]

---

[6] "The [C]ommission shall assess interest on any delinquent fee at the rate determined under section 2307(a) (relating to commission)." 58 Pa.C.S. §2308(a). Pursuant to section 2307(a) of Act 13, the "[C]ommission shall have the authority to make all inquiries and determinations necessary to calculate and collect the fee, administrative charges or assessments imposed under this chapter, including, if applicable, interest and penalties." 58 Pa.C.S. §2307(a).

[7] "In addition to the assessed interest under subsection (a), if a producer fails to make timely payment of the fee, there shall be added to the amount of the fee due a penalty of 5% of the amount of the fee if failure to file a timely payment is for not more than one month, with an additional 5% penalty for each additional month, or fraction of a month, during which the failure continues, not to exceed 25% in the aggregate." 58 Pa.C.S. §2308(b).

[8] "In addition to any other proceeding authorized by law, the [C]ommission may assess a civil penalty not to exceed $2,500 per violation upon a producer for the violation of this chapter. In **(Footnote continued on next page…)**

Petitioners filed numerous exceptions that objected to the ALJ's interpretation of the term "stripper well," determination that the disputed impact fees were not paid in a timely fashion, and conclusion that SBI's conduct justified the imposition of interest or penalties. I&E filed responses to the exceptions explaining why the ALJ did not err. (Commission's decision at 18-27.)

In a decision dated June 11, 2015, the Commission determined that the definition of "stripper well" was ambiguous because the word "any" was subject to multiple reasonable meanings, notably the interpretations proffered by the parties. In applying the factors for ascertaining legislative intent in section 1921(c) of the SCA, 1 Pa.C.S. §1921(c),[9] the Commission found, among other things, that adopting the

---

**(continued…)**

determining the amount of the penalty, the [C]ommission shall consider the willfulness of the violation and other relevant factors." 58 Pa.C.S. §2310(a).

[9] The statutory factors set forth in section 1921(c) of the SCA are as follows:

> (c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
>
> (1) The occasion and necessity for the statute.
>
> (2) The circumstances under which it was enacted.
>
> (3) The mischief to be remedied.
>
> (4) The object to be attained.
>
> (5) The former law, if any, including other statutes upon the same or similar subjects.
>
> (6) The consequences of a particular interpretation.

**(Footnote continued on next page…)**

interpretation put forth by Petitioners would: impede the collection of impact fees to provide relief to the municipalities affected by the drilling of gas wells in their boundaries, one of the primary purposes of Act 13; permit unscrupulous drillers to artificially lower the amounts produced in one month of the year in order to avoid paying impact fees; and contravene the General Assembly's intent, which was evidenced by the General Assembly's replacing of "a" with the word "any" in the final version of Act 13. The Commission further concluded that the ALJ's interpretation was consistent with the Commission's interpretations in the Reconsideration Order and Proposed Rulemaking Order. (Commission's decision at 37-43.)

In addition, the Commission found no error in the ALJ's conclusion that the impact fees are not taxes because such fees are not imposed on all or many citizens, but only on some producers of natural gas as a condition and privilege for the extraction of that gas, and do not raise revenue directly for the Commonwealth's general fund. Citing our Supreme Court's decision in *Dechert LLP v. Commonwealth*, 998 A.2d 575, 584 n.8 (Pa. 2010) ("[W]hile any doubt or uncertainty as to the imposition of a tax must be resolved in the favor of the taxpayer, such doubt is only implicated after our efforts at statutory construction yield no definitive conclusion") (internal quotation marks and citation omitted), the Commission also determined that it was not required to construe the ambiguity in SBI's favor because

---

**(continued…)**

        (7) The contemporaneous legislative history.

        (8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. §1921(c).

the statutory construction factors led to a definitive conclusion that the General Assembly intended "any" to mean "all" or "every." Finally, the Commission concluded that the ALJ did not err in finding that SBI violated Act 13 by not paying impact fees on the wells at issue and that the imposition of interest and penalties was mandatory pursuant to sections 2308(a) and (b) of Act 13. However, the Commission agreed with Petitioners that a discretionary civil penalty was not warranted under the facts and circumstances of this case and granted the exceptions related to that issue. (Commission's decision at 43-67.)

Petitioners then filed petitions for review with this Court. By single-judge order dated August 12, 2015, this Court granted SBI's motion for a stay and directed SBI to perfect and post a bond to cover 120% of the remaining unpaid balance of what the Commission determined SBI owed in impact fees, interest, and penalties. SBI filed an appeal bond, and the parties thereafter argued this matter before the Court *en banc*.

## Discussion

On appeal to this Court,[10] Petitioners argue that the Commission erred in its interpretation of the word "any" in the definition of a "stripper well." Petitioners contend that "any" is an unambiguous term and that its plain usage in the vernacular "means 'one' – it does not mean 'each and every' or 'all.'" (SBI's brief at 17; *accord* PIOGA's brief at 29.) In the alternative, Petitioners assert that "any" is ambiguous,

---

[10] Our scope of review of the Commission's order is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings, determinations or order are supported by substantial evidence. *Regency Transportation Group, Ltd. v. Pennsylvania Public Utility Commission*, 44 A.3d 107, 110 n.3 (Pa. Cmwlth. 2012).

and because the impact fees are bona fide taxes, the term must be construed in their favor as taxpayers per section 1928(b)(3) of the SCA.

## Statutory Interpretation Principles

The cardinal rule of all statutory interpretation is to ascertain and effectuate the intent of the General Assembly. *O'Rourke v. Commonwealth of Pennsylvania, Department of Corrections*, 778 A.2d 1194, 1201 (Pa. 2001). To accomplish that goal, "statutory language must be read in context, that is, in ascertaining legislative intent, every portion of statutory language is to be read together and in conjunction with the remaining statutory language, and construed with reference to the entire statute as a whole." *Pennsylvania Gaming Control Board v. Office of Open Records*, 103 A.3d 1276, 1285 (Pa. 2014).

Where the words of a statute are clear and free from ambiguity, the legislative intent is to be gleaned from those very words, and the plain language is not to be disregarded under the pretext of pursuing its spirit. *Pennsylvania Financial Responsibility Assigned Claims Plan v. English*, 664 A.2d 84, 87 (Pa. 1995); *Coretsky v. Board of Commissioners of Butler Township*, 555 A.2d 72, 74 (Pa. 1989). "Only if a statute is unclear may a court embark upon the task of ascertaining the intent of the legislature by reviewing the necessity of the act, the object to be attained, circumstances under which it was enacted and the mischief to be remedied." *Coretsky*, 555 A.2d at 74. Stated somewhat differently, the statutory construction factors listed in section 1921(c) of the SCA only become pertinent when the language of the statute is ambiguous. *Ramich v. Workers' Compensation Appeal Board (Schatz Electric, Inc.)*, 770 A.2d 318, 322 (Pa. 2001); *accord Commonwealth v. Dellisanti*, 876 A.2d 366, 369 (Pa. 2005). "A statute is ambiguous when there are at

least two reasonable interpretations of the text under review." *Warrantech Consumer Product Services, Inc. v. Reliance Insurance Co.*, 96 A.3d 346, 354-55 (Pa. 2014).

The SCA instructs courts that words and phrases are to be interpreted according to their common and approved usage. Section 1903(a) of the SCA, 1 Pa.C.S. §1903(a). "The word 'any' is defined by Webster as 'one indifferently out of a number.' It is an indefinite pronominal adjective used to designate things in a general way without pointing out any one in particular." *Benat v. Mutual Benefit Health and Accident Association*, 159 A.2d 23, 25 (Pa. Super. 1960) (citations omitted); *see Maierhoffer v. GLS Capital, Inc.*, 730 A.2d 547, 550 (Pa. Cmwlth. 1999) ("In common usage, 'any' means 'one or more indiscriminately from all.'") (citation omitted). To be sure, the term "any" conveys a full spectrum of quantities, including: (1) one; (2) one, some, or all regardless of quantity; (3) one or more; (4) great, unmeasured, or unlimited in amount; and (5) all. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (1976). Typically, "[t]he significance of the word 'any' is discoverable in its context." *Benat*, 159 A.2d at 25 (citations omitted).

<u>Plain Language Analysis</u>

Section 2302(f) of Act 13 imposes, on an annual basis, scheduled impact fees on a "vertical unconventional gas well . . . ." 58 Pa.C.S. §2302(f). For purposes of impact fees, the parties concede that a "vertical gas well" and a "stripper well" differentiate each other. A vertical gas well is subject to the impact fee, while a stripper well, which does not reach the necessary production level, is not. Although there may be one instance where the two wells are not functionally the same, *i.e.,*

9

when a stripper well does not utilize the fracking technique,[11] there is no dispute in this case that the gas wells at issue will qualify as either stripper wells or vertical wells, depending on their level of production.

Section 2301 of Act 13, entitled "Definitions," defines these two types of wells as follows:

> "Stripper well" – An unconventional gas well incapable of producing more than 90,000 [cf] of gas per day during **any** calendar month, including production from all zones and multilateral well bores at a single well, without regard to whether the production is separately metered.
>
> *        *        *
>
> "Vertical gas well" – An unconventional gas well which utilizes hydraulic fracture treatment through a single vertical well bore and produces natural gas in quantities greater than that of a stripper well.

58 Pa.C.S. §2301 (emphasis supplied).[12]

Viewing the plain language of the statutory provision in a common sense fashion, we agree with Petitioners that the word "any" in the definition of "stripper well" is unambiguous and it clearly and plainly means what it says – "any month." Pursuant to subsections 2302 (b) and (f) of Act 13, the impact fees are imposed for

---

[11] *See* 58 Pa.C.S. §2301 (definitions for "Stripper well," "Vertical gas well," "Unconventional gas well," and "Unconventional formation"); *infra* note 5.

[12] An "unconventional gas well" is "[a] bore hole drilled or being drilled for the purpose of or to be used for the production of natural gas from an unconventional formation." 58 Pa.C.S. §2301. An "unconventional formation" is "A geological shale formation existing below the base of the Elk Sandstone or its geologic equivalent stratigraphic interval where natural gas generally cannot be produced at economic flow rates or in economic volumes except by vertical or horizontal well bores stimulated by hydraulic fracture treatments or by using multilateral well bores or other techniques to expose more of the formation to the well bore." *Id.*

the "calendar year." 58 Pa.C.S. §2301(b) and (f).[13] Because a calendar year is a definite class consisting of twelve individual months, the most natural way to construe "any" is to interpret it to mean at least "one" month out of the year, no matter what or which month ("during any calendar month"). This reading is bolstered by the fact that "any" is located within a prepositional phrase and modifies the singular noun, "calendar month," which signifies that only one or a singular month is contemplated in the grammatical scheme. *See* William A. Sabin, *The Gregg Reference Manual* 238, 259 (9th ed. 2001) (stating that the term "any" is singular when it modifies a singular noun). Notably, section 2301 of Act 13 does not say "in any calendar month**[s]**," which would tend to suggest that the General Assembly intended "any" to be the equivalent of "every" or "all" months.

In *Commonwealth v. Davidson*, 938 A.2d 198 (Pa. 2007), our Supreme Court interpreted language in a statute that made it illegal to possess a certain type of image in "any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material." *Id.* at 218-19 (citation omitted). Initially, the Supreme Court observed that "[t]he General Assembly's use of the term 'any,' which could mean one or more items, suggests a lack of restriction or limitation," and went on to determine whether possession of multiple images comprised one criminal offense or whether possession of a single image, in and of itself, "constitutes a

---

[13] SBI submitted an annual report listing each well and the total gas produced on a per day, average monthly basis. (Reproduced Record (R.R.) at 76a.) The Commission found that this report accurately set forth the amount of gas produced, (Commission's decision at 6), and there is no issue before this Court whether the term "per day" in "stripper well" is a literal as opposed to an averaged figure. Nonetheless, in its Rulemaking Order, the Commission stated: "In order to determine average daily production levels for a vertical gas well, the Commission expects producers to divide the well's monthly production by the number of days the wells are in production in the relevant calendar month(s)." Rulemaking Order, at 8, n.14.

11

distinct occurrence of offensive conduct. . . ." *Id.* at 219. The Supreme Court noted with paramount significance that "all of the objects listed in the statute are singular," *id.*, and effectively determined that "any" means "one" image, regardless of its medium, and not "every" or "all" images. On this reasoning, the *Davidson* court concluded that "[t]he plain language of the statute evidences the intent of the General Assembly to make each image . . . possessed by an individual a separate, independent crime." *Id.*

Given the presence of singular nouns in the pertinent statutory phrase, the Supreme Court in *Davidson* interpreted "any" in its singular (one out of many) as opposed to plural sense (every one), and declined to construe "any" as encompassing all of the numerous images in the defendant's possession. Through logical extrapolation, this Court reaches a conclusion similar to and aligned with *Davidson* and, consistent with the reasoning in that opinion, we construe "any" to mean "one." Therefore, based upon the plain and unambiguous language of section 2301 of Act 13, we conclude that when an unconventional gas well cannot produce more than 90,000 cf of gas in at least one month, it is a stripper well and is not subject to impact fees.[14]

The Commission contends that section 2302(d) of Act 13, which governs fees for "restimulated" wells, 58 Pa.C.S. §2302(d), compels the conclusion that the General Assembly intended "any" in the definition of "stripper well" to mean "every" or "all." This provision states:

(d) Restimulated unconventional gas wells.

_____

[14] Conversely, a "[v]ertical gas well" is a well that produces more than 90,000 cf in every month during the calendar year.

12

(1) An unconventional gas well which after restimulation qualifies as a stripper well shall not be subject to this subsection.

(2) The year in which the restimulation occurs shall be considered the first year of spudding for purposes of imposing the fee under this section if:

(i) a producer restimulates a previously stimulated unconventional gas well following the tenth year after being spud by:

(A) hydraulic fracture treatments;

(B) using additional multilateral well bores;

(C) drilling deeper into an unconventional formation; or

(D) other techniques to expose more of the formation to the well bore; and

(ii) the restimulation results in a substantial increase in production.

(3) As used in this subsection, the term "substantial increase in production" means an increase in production amounting to more than 90,000 cubic feet of gas per day during a calendar month.

58 Pa.C.S. §2302(d).

However, this statutory section is inapplicable and not informative because it deals with a unique brand of fees that are separate and distinct from impact fees under section 2302(f) of Act 13. More importantly, our interpretation of "stripper well" is entirely consonant with the definitional concepts of "stripper well" and a substantial increase in restimulation in subsections (1) and (3) of section 2302(d). Quite simply, a restimulation fee will be imposed when an unconventional gas well is restimulated and produces more than 90,000 cf of gas a month, *see* 58 Pa.C.S. §2302(d)(1), but is – or will become – a "stripper well" not subject to the

13

restimulation fee if it produces less than 90,000 cf of gas in **one month**.  *See* 58 Pa.C.S. §2302(d)(3).  Indeed, the Commission has suggested this result in its Reconsideration Order, where it determined that "[a] vertical gas well which falls below designated production levels is no longer, by definition, a vertical gas well," but, instead, is a stripper well. *Id.* at 4.

Ultimately, the Commission's interpretation of "any" in a broad manner to mean "every" is misplaced and would have this Court engraft non-existent verbiage onto the definition of "stripper well," which is something that we are simply not authorized to do.  *See Shafer Electric & Construction v. Mantia*, 96 A.3d 989, 994 (Pa. 2014) ("[I]t is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include."); *Halko v. Board of Directors of School District of Foster Township.*, 97 A.2d 793, 794 (Pa. 1953) ("We cannot rewrite the statute.").  It is the General Assembly's duty to write the laws and the General Assembly could have easily replaced the word "any" with the term "every" if it so intended.  But the General Assembly did not take this course of action, and this Court cannot alter the plain language of the statutory text.

Having concluded that the term "any" is unambiguous and plainly means "one," there is no need for us to resort to the statutory construction factors that the Commission relied upon, *see* 1 Pa.C.S. §1921(c), including the contemporaneous legislative history; the occasion and necessity for impact fees; and the perceived consequences of Petitioners' interpretation, particularly the notion that well producers will intentionally lower production for one month to avoid paying impact fees.  *See Dellisanti*, 876 A.2d at 369; *Ramich*, 770 A.2d at 322.  Furthermore, because our decision is based solely on the plain language of section 2301 of Act 13, the Commission is not entitled to any administrative deference in its interpretation of this

provision. *See Seeton v. Pennsylvania Game Commission*, 937 A.2d 1028, 1037 (Pa. 2007).

Ambiguity Analysis

Nonetheless, this Court concludes in the alternative that Petitioners' proposed interpretation is, at the very least, reasonable. Assuming that the Commission's interpretation is also reasonable, the term "any" is ambiguous and resort to statutory construction factors is necessary. *See Warrantech Consumer Produce Services*, 96 A.3d at 354-55; *Ramich*, 770 A.2d at 322.

With respect to application of the statutory construction factors, this Court is not persuaded by the Commission's contention that unless "any month" is recast to mean "every month," a well producer could theoretically alter the infrastructure or take other measures to escape paying impact fees. (Commission's decision at 41.) Notably, this claim was never made against SBI, the well producer in this case. To meet the definition of a "stripper well," the producer is obligated to demonstrate that the subject well is "incapable" of producing 90,000 cf of gas and, consequently, any deliberate efforts to depress production will not succeed in establishing that the well is incapable of meeting the threshold level of production. Indeed, such unscrupulous behavior by a well producer would naturally come with the risk of civil penalties and fines under Act 13's enforcement provisions. Moreover, the record clearly shows here that SBI submitted records of well operation which reflected it had consistently operated the wells to full capacity. This representation was never challenged by the Commission. We therefore conclude, contrary to the Commission, that Petitioners' interpretation would not thwart or undermine the purpose of Act 13 or permit well producers to escape its requirements.

15

Similarly, this Court finds unpersuasive the Commission's conclusion that Petitioners' interpretation would frustrate legislative intent by impeding the collection of impact fees, which the Commission considered to be one of the primary purposes of Act 13. (Commission's decision at 40-41.) In our view, the Commission's analysis rests upon a shaky foundation in its belief that "stripper well" should be interpreted narrowly in order to provide for greater reimbursement to the government. Regardless of whether a well is a "stripper well" or a "vertical well," it is possible that the surrounding areas will be subjected to some detrimental effect, but our General Assembly, as the policy-making branch of government, decided to exempt "stripper wells" from impact fees.

More importantly, we do not believe that the definition of "stripper well" should be liberally construed based upon the sheer desire to collect a larger amount of so-called "impact fees." According to the Dissent, "the imposition of Act 13 impact fees . . . are collected to provide relief to municipalities affected by unconventional gas drilling, a primary purpose of the statute." (Dissent op. at 2-3.) To the contrary, local municipalities are not the primary recipient of reimbursement from the impact fees. *See* Section 2314 of Act 13, 58 Pa.C.S. §2314. Instead, impact fees are placed in a general fund and are appropriated in a predetermined numerical basis first to county conservation districts, then to enumerated state agencies, a natural case development program, and, finally, the municipalities, as a whole, receive a nominal percentage of the revenue then remaining in the fund. Section 2314(d) of Act 13, 58 Pa.C.S. §2314(d). Notably, placing impact fees aside, a county or municipality may adopt an ordinance imposing its own yearly fees on well producers and these fees apply to a "stripper well" and "vertical gas well" alike and in the same manner. *See* Section 2302(b) of Act 13, 58 Pa.C.S. §2302(b) (stating that a fee adopted by a

16

county or municipality will be "imposed on every producer and shall apply to unconventional gas wells spud in this Commonwealth regardless of when spudding occurred."); 58 Pa.C.S. §2301 (defining a "vertical gas well" and a "stripper well" as both being "unconventional gas wells."). Because a county or municipality may impose its own fees on an unconventional gas well, in accordance with a statutory graduated scale beginning with a range of $40,000.00 to $60,000.00 per well, this appears to be the primary means by which the municipalities receive money under Act 13. In all events, the municipalities are incidental beneficiaries of impact fees, and it cannot be said that the General Assembly's paramount intent in devising impact fees was to provide financial relief to the municipalities. Accordingly, we find the Commission's statutory construction analysis unfounded and unconvincing.

Further, much was made by the Commission of the General Assembly's deletion of "a" and insertion of "any" in the final version of the definition of "stripper well," which the Commission believes reflects the General Assembly's intent that "any" means "every." (Commission's decision at 41.) Even if "any" is an ambiguous term, and analysis of the contemporaneous legislative history is proper, we do not ascribe any significance to this change because there is no explanation from the General Assembly or committee members that accounts for it. In this context, it is fair to say that such changes in style or word usage disclose nothing about the General Assembly's intent — except the intent to express itself in language it thought more acceptable. *See Consumers Education and Protective Association v. Schwartz*, 432 A.2d 173, 178-89 (Pa. 1981) (concluding that this Court engaged in "pure speculation" when we viewed changes to language in drafts of legislation as evidence of legislative intent because there was no expressed reason for the changes).

17

Accordingly, we conclude that consideration of legislative history does not militate in favor of the Commission's interpretation.

Finally, although the Commission concluded that I&E's interpretation was consistent with the Commission's previous orders, (Commission's decision at 42), the Commission concedes that in its Proposed Rulemaking Order, it never enunciated an interpretation for the term "any" in the definition of a "stripper well," (Commission's decision at 40), nor did it previously find the term to be ambiguous. As a result, the Commission in the present case felt obligated to consider the principles of statutory construction in order to devise, for the first time, an interpretation pertaining to the production levels of a "stripper well." (Commission's decision at 40.)[15]

---

[15] In its current decision, the Commission stated:

> In the [Proposed] Rulemaking Order, we explained the production levels necessary to qualify as a vertical gas well. Id. at 8. We clarified that if a vertical well produces gas in quantities greater than that of a stripper well in only one month of a calendar year, that vertical well will be subject to Act 13 fees. However, the term 'any' is not included in the definition of a 'vertical well.' Rather, 'any' only appears in the definition of a stripper well. Furthermore, a vertical well is defined by what it is not – a stripper well. Therefore, our interpretation of 'any' in the [Proposed] Rulemaking Order was in the context of the vertical gas well . . . . As indicated above by the diversity of meaning of the word 'any,' context is important. Thus, the potential for more than one possible meaning of the word requires consideration of the principles of statutory construction in this proceeding.

 (Commission's decision at 40.)  An examination of the Commission's previous orders reveals that, while the Commission stated that a "vertical gas well" is one that produces more than a stripper well in only one month, the Commission never set forth or explained what production levels a "stripper well" must produce in order to be designated as such.  See Proposed Rulemaking Order, at 8 ("[E]ven if a vertical gas well produces natural gas in quantities greater than that of a stripper well **(Footnote continued on next page…)**

18

Where an agency's interpretation is presented in the course of litigation and has not been articulated previously in an official rule or regulation, the interpretation may still be given deference but only to the extent that it is persuasive. *Securities Exchange Commission v. Rosenthal*, 650 F.3d 156, 160 (2d Cir. 2011).

Here, I&E, a subdivision of the Commission, proffered its instant interpretation of "stripper well" for the first time during the course of this litigation via a complaint and enforcement action against SBI. Acting in its capacity as an administrative tribunal reviewing an ALJ's determination, the Commission accepted I&E's definition of the term "any." Because the Commission's interpretation (or more accurately, I&E's interpretation) was not previously announced in an official rule, regulation, or formal adjudication, if it is entitled to a degree of deference, that deference is not so great as to definitively resolve the ambiguity in the word "any." This is especially true considering that none of the other statutory construction factors offer persuasive support for the Commission's interpretation, and the Commission has concluded that "any" is ambiguous without providing any convincing rationale as to why its interpretation is reasonable, or is equally as reasonable as, Petitioners on a textual level.

Moreover, in its Proposed Rulemaking Order, the Commission appears to have taken the view that "any" means "one," at least when that term is implied into

---

**(continued…)**

in only *one* month of a calendar year, that vertical well will be subject to the fee for that year.") (emphasis in original). And in discussing the production levels for a "vertical gas well," the Commission merely repeated the ambiguity presented in the case, offering no clarification or meaningful distinction between a vertical gas well and a stripper well. *See* Reconsideration Order, at 4 ("If a vertical gas well qualifies as such, via production levels, during any calendar month in a calendar year, that well will be subject to the impact fee."); Proposed Rulemaking Order, at 7 (same).

the definition of "vertical well," and it is incongruous for the Commission to now say that "any" means "all" for purposes of distinguishing and defining a "stripper well." *See* Proposed Rulemaking Order, at 8 ("All vertical gas wells on the Department of Environmental Protection's (DEP) spud list as of December 31 of each year will be subject to the fee for that year unless the producer verifies to the Commission that a particular well did not produce natural gas in quantities greater than that of a stripper well *during any calendar month* in the reporting year.  This means that even if a vertical gas well produces natural gas in quantities greater than that of a stripper well in only *one* month of a calendar year, that vertical well will be subject to the fee for that year.") (emphasis in original).  Clearly, the Commission interpreted the phrase "during any calendar month" to mean "only one month of the year" but it offers a contrary view in the matter at hand.  An administrative agency's "interpretation of its statute is entitled to little deference when it is at odds with a prior interpretation." *Dauphin County Industrial Development Authority v. Pennsylvania Public Utility Commission*, 123 A.3d 1124, 1135 (Pa. Cmwlth. 2015).[16]  Tellingly, the Commission does not advance any practical explanation or public policy rationale for its 180 degree turn.  As such, we conclude that the legal concept of administrative deference cannot settle the ambiguity.

---

[16] With respect to a "stripper well," the Dissent's reading identifies the Commission's interpretation of "any" to mean one, but the Dissent fails to mention that the Commission previously proffered the same definition of "any" when construing a "vertical well."  (Dissent op. at 2.)  Simply put, the Commission cannot have it both ways.  Even the United States Supreme Court has said so. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) (stating that deference is unwarranted when there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question," which "might occur when the agency's interpretation conflicts with a prior interpretation").

20

Consequently, assuming that the term "any" is ambiguous and after undertaking an examination of the pertinent statutory construction factors, this Court concludes that "any" would still remain an ambiguous term. In our role as the judiciary, tasked with the obligation of deciphering legislative intent, it is our responsibility to resolve this ambiguity consistent with the rules of statutory construction. According to Petitioners, Act 13 imposes a tax; however, this Court need not go so far because we can rest on narrower grounds, namely that Act 13, at the very least, inflicts a penalty. *See United States v. La Franca*, 282 U.S. 568, 572 (1931) (differentiating a "tax" from a "penalty").

In this case, as a direct result of an ambiguous term in Act 13, the Commission ordered SBI to pay a mandatory 25% percent statutory civil penalty on amounts that SBI would not have had to owe but-for the ambiguity. *See* 58 Pa.C.S. §2308(b) ("[T]here shall be added to the amount of the fee due a penalty . . . not to exceed 25% in the aggregate."). Significantly, this civil penalty is penal in nature and implicates the rule of lenity and the rule of strict construction. *See Louisiana Board of Ethics v. Holden*, 121 So.3d 113, 118 (La. Ct. App. 2013) ("Because violations of the [statute] can result in the assessment of a civil penalty . . . the statute is penal in nature . . . ."); 3A Sutherland, STATUTORY CONSTRUCTION §75.06 (5th ed. 1992) ("A penalty provision in a statute should be strictly construed in favor of the person being penalized."); *see also* Section 1928 of the SCA (requiring that every penal provision, whether in a civil or criminal statute, be strictly construed).

"The rule of lenity provides that where a statute is penal and the language of the statute is ambiguous, the statute must be construed in favor of the defendant . . . and against the government." *Sondergaard v. Department of Transportation, Bureau of Driver Licensing*, 65 A.3d 994, 997-98 (Pa. Cmwlth.

2013). "The rule of lenity provides a means of assuring fairness to persons subject to the law by requiring penal statutes to give clear and unequivocal warning in language that people generally would understand, as to what actions would expose them to liability for penalties and what the penalties would be." *Sawink, Inc. v. Philadelphia Parking Authority*, 34 A.3d 926, 932 (Pa. Cmwlth. 2012) (en banc).

In a similar vein, section 1922(3) of the SCA provides a presumption that the General Assembly does not intend to enact laws that are unconstitutional, 1 Pa.C.S. §1922(3), "and statutes are to be construed whenever possible to uphold their constitutionality." *In re William L.*, 383 A.2d 1228, 1231 (Pa. 1978). In discussing the unconstitutionality of vague statutes, the United States Supreme Court has explained:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). A statute is void for vagueness if it: (1) fails to provide fair warning as to what conduct will subject a person to liability, or (2) fails to contain an explicit and ascertainable standard to prevent arbitrary and discriminatory enforcement. *See Pennsylvania Medical Society v. Foster*, 585 A.2d 595, 598 (Pa. Cmwlth. 1991) (en banc).

22

Having determined that the term "any" reflects an unresolved ambiguity within Act 13, and that SBI sustained civil penalties due to that ambiguity, this Court applies the rule of lenity. We find that application of the rule is especially necessary in order to maintain a constitutional application of Act 13, as to SBI in this particular case, because the definitions of and distinction between a "vertical well" and a "stripper well" is patently vague and the Commission has not articulated its interpretation previously in an official rule, regulation, or formal adjudication. *See Upton v. Securities Exchange Commission*, 75 F.3d 92, 98 (2d Cir. 1996); *General Electric Co. v. United States Environmental Protection Agency*, 53 F.3d 1324, 1328-31 (D.C. Cir. 1995).[17] Therefore, we must construe the word "any" in favor of SBI and the net result is that SBI's interpretation prevails over the interpretation proffered by the Commission.

## Conclusion

For the above-stated reasons, we conclude that the word "any" in the term "stripper well" unambiguously means "any" or "one" and not "all" or "every." Because the uncontroverted evidence establishes that the wells at issue have produced less than 90,000 cf of gas in at least one month, (R.R. at 76a), they are "stripper wells" and SBI does not have to pay impact fees for these wells. Alternatively, assuming, *arguendo,* that "any" is an ambiguous term, this Court concludes that an analysis of the statutory construction factors do not resolve the ambiguity and that the ambiguity must be construed in favor of SBI. Accordingly, we reverse the

---

[17] *See also Solid Waste Agency of N. Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 174 (2001); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 574-75 (1988).

23

Commission's conclusion that SBI violated Act 13 and owed impact fees for improperly listed stripper wells. With there being no violation of Act 13, we also reverse the Commission's imposition of interest and penalties on SBI.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Snyder Brothers, Inc.,           :
        Petitioner    :
                    :   No.  1043 C.D. 2015
      v.             :
                    :
Pennsylvania Public Utility     :
Commission,             :
        Respondent   :
                    :
Pennsylvania Independent Oil & Gas :
Association,            :
        Petitioner    :
                    :   No.  1175 C.D. 2015
      v.             :
                    :
Pennsylvania Public Utility     :
Commission,             :
        Respondent   :

## ***ORDER***

AND NOW, this 29th day of March, 2017, the June 11, 2015 order of the Pennsylvania Public Utility Commission is reversed.

_____

PATRICIA A. McCULLOUGH, Judge

Snyder Brothers, Inc.,                    :
                                          :
                    Petitioner            :
                                          :
          v.                              : No. 1043 C.D. 2015
                                          :
                                          :
Pennsylvania Public Utility               :
Commission,                               :
                                          :
                    Respondent            :


Pennsylvania Independent Oil & Gas        :
Association,                              :
                                          :
                    Petitioner            :
                                          :
          v.                              : No. 1175 C.D. 2015
                                          : Argued:  February 8, 2017
Pennsylvania Public Utility               :
Commission,                               :
                                          :
                    Respondent            :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JULIA K. HEARTHWAY, Judge
           HONORABLE JOSEPH M. COSGROVE, Judge


DISSENTING OPINION
BY JUDGE WOJCIK                              FILED:  March 29, 2017

I respectfully dissent from the majority's thoughtful opinion because I would affirm the Pennsylvania Public Utility Commission's (PUC) interpretation of the definition of "stripper well" in Section 2301 of the statute commonly referred to as Act 13, 58 Pa. C.S. §2301. To be considered a type of unconventional gas well, or a "vertical gas well," upon which Act 13 impact fees may be levied, the well must produce natural gas in quantities greater than that of a "stripper well." *Id.* In turn, Act 13 defines "stripper well" as:

> An unconventional gas well *incapable* of producing more than 90,000 cubic feet of gas per day during *any* calendar month, including production from all zones and multilateral well bores at a single well, without regard to whether the production is separately metered.

*Id.* (emphasis added).

As explained by the majority, the central dispute in this case concerns the meaning of the word "any" within the foregoing definition. The PUC determined that if a well produces more than the specified production level in any one month, it is capable of reaching this level and should not be deemed to be a "stripper well" under Act 13. Instead, such a well is considered to be a "vertical gas well" subject to the Act 13 impact fees. In contrast, Snyder Brothers, Inc. and intervenor Pennsylvania Independent Oil & Gas Association (collectively, Petitioners) contend that the term "any" in the definition means "all," "each," or "every" so that a well is only subject to the Act 13 impact fees if its production level exceeds the specified statutory minimum in every month.

I agree with the PUC's rationale and result in this case and in prior decisions[1] based on statutory construction principles. The Superior Court has explained that "'[a]ny' is a broad and comprehensive term and generally means 'all' or 'every,' but not always. Its significance is discoverable in its context and often by considering other relevant legislation." *Board of Christian Education v. School District of the City of Philadelphia*, 91 A.2d 372, 378 (Pa. Super. 1952).

As noted by the PUC, adopting Petitioners' construction would impede the imposition of Act 13 impact fees, which are collected to provide relief to municipalities affected by unconventional gas drilling, a primary purpose of the statute.[2] The PUC correctly explained that Petitioners' construction contravenes the General Assembly's intent that is manifested in the legislative history of Act 13's enactment because the word "a" was removed and replaced by the word "any"

---

[1] *See* Act 13 of 2012-Implementation of Unconventional Gas Well Impact Fee Act, Reconsideration Order Regarding Chapter 23, Docket No. M-2012-2288561, entered July 19, 2012; Act 13 of 2012-Implementation of Unconventional Gas Well Impact Fee Act, Proposed Rulemaking Order, Docket No. L-2013-2375551, entered October 17, 2013.

[2] Citing Section 2314 of Act 13, 58 Pa. C.S. §2314, the majority mischaracterizes the affected municipalities as merely "incidental beneficiaries" of the impact fees paid under Act 13. Majority op. at 17-18. To the contrary, as explained by the PUC, "[Act 13] provides for the imposition of an unconventional gas well fee (also called an impact fee), and the distribution of those funds to local and state governments. . . . A significant portion of the funds collected will be distributed directly to local governments to cover the local impacts of drilling." http://www.puc.pa.gov/filing_resources/issues_laws_regulations/act_13_impact_fee_.aspx (last visited March 24, 2017). Indeed, as provided in Section 2314(d), following disbursements to conservation districts and state agencies, a full "60% of the revenue remaining in the fund from fees collected for the prior year are hereby appropriated to counties and municipalities for purposes authorized under subsection (g)." 58 Pa. C.S. §2314(d). Moreover, the amount of impact fees paid to municipalities is so significant that the General Assembly has set a ceiling regarding the amount that a municipality may receive. 58 Pa. C.S. §2314(e). By expressly providing for the collection and distribution of such impact fees to municipalities within the body of Act 13, the General Assembly manifestly stated as paramount its intent to mitigate the negative effects of such unconventional drilling.

in a different provision of the statute dealing with stripper wells. *See* Section 1921(c)(4), (7) of the Statutory Construction Act, 1 Pa. C.S. §1921(c)(4), (7) ("[T]he intention of the General Assembly may be ascertained by considering . . . [t]he object to be attained [and t]he contemporaneous legislative history.").

I agree that adopting this construction would encourage drillers to artificially suppress production levels to pierce the statutory floor in one month thereby avoiding the payment of impact fees for an entire calendar year regardless of production in the other months of that year. *See* Section 1921(c)(8) of the Statutory Construction Act, 1 Pa. C.S. §1921(c)(8) ("[T]he intention of the General Assembly may be ascertained by considering . . . [t]he consequences of a particular interpretation."); Section 1922(1), (5), 1 Pa. C.S. §1922(1), (5) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: . . . That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable[; and] That the General Assembly intends to favor the public interest against any private interest.").

The PUC also properly relied on *Dechert LLP v. Commonwealth*, 998 A.2d 575, 584-86 (Pa. 2010), to avoid construction in Petitioners' favor[3] because its statutory construction analysis definitively reveals the General Assembly's intent. "Moreover, when construing statutory language, it is this Court's practice

---

[3] *See* Section 1928(b)(3) of the Statutory Construction Act, 1 Pa. C.S. §1928(b)(3) ("All provisions of a statute of the classes hereinafter enumerated shall be strictly construed: . . . (3) Provisions imposing taxes."). *But cf. Board of Christian Education*, 91 A.2d at 378 ("[A]fter a study of the legislative background, Chief Justice Moschzisker found that an Act authorizing a city to make a new assessment in 'any ward or wards' empowered it to make a new assessment for the whole city. *Glen Alden Coal Co. v. City of Scranton*, [127 A. 307, 308 (Pa. 1925)].").

to afford substantial deference to the interpretation rendered by the agency charged with its administration." *Id.* at 586 (citation omitted). *See also* Section 1921(c)(8) of the Statutory Construction Act, 1 Pa. C.S. §1921(c)(8) ("[T]he intention of the General Assembly may be ascertained by considering . . . administrative interpretations of such statute.").[4] Finally, I discern no error in the PUC's decision to refrain from imposing a discretionary civil penalty, or imposing mandatory interest and penalties under Section 2308(a) and (b).[5]

---

[4] The majority makes much of the fact that the PUC has interpreted the word "any" to have a different meaning with respect to the provisions relating to vertical wells. Majority op. at 20-21. However, it is well settled that "precisely the same words, or combination of words, may have different meanings when used under varying circumstances," and that "'[w]hen used under different circumstances and with different context, the same words may express different intentions.'" *Commonwealth ex rel. Woodruff v. Benn*, 131 A. 253, 258 (Pa. 1925) (citations omitted). *See also Public School Employees' Retirement System v. Pennsylvania School Boards Association, Inc.*, 682 A.2d 291, 295 (Pa. 1996) (Cappy, J. dissenting) ("That the term 'full school year' can mean different things in different statutory contexts (and even within the same statutory context) and for different purposes proves to me that the Board's regulation which defines 'full school year' for purposes of crediting retirement benefits, where the [Public School Employees'] Retirement Code[, 24 Pa. C.S. §§8101-8534,] is admittedly silent as to the definition, is not unreasonable, and therefore, should not be stricken."). This is particularly true where the word "'[a]ny' is a broad and comprehensive term," and "[i]ts significance is discoverable in its context and often by considering other relevant legislation." *Board of Christian Education*, 91 A.2d at 378. Thus, the PUC's differing interpretation of the same "broad and comprehensive term" does not relieve this Court of our duty to defer to the PUC's interpretation of Act 13. *See, e.g., Tool Sales & Service v. Board of Finance and Revenue*, 637 A.2d 607, 613 (Pa. 1993) ("It is a well-established principle of administrative law that agencies are entitled deference in interpreting the statutes they enforce. Other courts in this Commonwealth have held that an administrative agency's interpretation should be overturned or disregarded only for cogent reasons or where it is 'clearly erroneous.' Where the statutory scheme is [] technically complex [], 'a reviewing court must be even more chary to substitute discretion for the expertise of the administrative agency.'") (citations omitted).

[5] 58 Pa. C.S. §2308(a) and (b). Section 2308(a) and (b) state:

**(Footnote continued on next page…)**

Accordingly, unlike the majority, I would affirm the PUC's order.

MICHAEL H. WOJCIK, Judge

Judge Cosgrove joins in this dissent.

_____

**(continued…)**

**(a) Assessment.**—The commission shall assess interest on any delinquent fee at the rate determined under section 2307(a) (relating to commission).

**(b) Penalty.**—In addition to the assessed interest under subsection (a), if a producer fails to make timely payment of the fee, there shall be added to the amount of the fee due a penalty of 5% of the amount of the fee if failure to file a timely payment is for not more than one month, with an additional 5% penalty for each additional month, or fraction of a month, during which the failure continues, not to exceed 25% in the aggregate.