**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| SNYDER BROTHERS, INC., | : | No. 47 WAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court entered March |
| | : | 29, 2017 at No. 1043 CD 2015, |
| v. | : | reversing the Order of the Public Utility |
| | : | Commission entered June 11, 2015 at |
| | : | No. C-2014-2402746 |
| PENNSYLVANIA PUBLIC UTILITY | : | |
| COMMISSION, | : | ARGUED: April 11, 2018 |
| | : | |
| Appellant | : | |
| | | |
| PENNSYLVANIA INDEPENDENT OIL & | : | No. 48 WAP 2017 |
| GAS ASSOCIATION, | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court entered March |
| | : | 29, 2017 at No. 1175 CD 2015, |
| | : | reversing the Order of the Public Utility |
| v. | : | Commission entered June 11, 2015 at |
| | : | No. C-2014-2402746 |
| | : | |
| PENNSYLVANIA PUBLIC UTILITY | : | ARGUED: April 11, 2018 |
| COMMISSION, | : | |
| | : | |
| Appellant | : | |


## OPINION

**JUSTICE TODD**                 **DECIDED: DECEMBER 28, 2018**

At issue in this appeal is whether producers of natural gas from certain vertical wells are subject to assessment of the yearly impact fee established by Chapter 23 of the

Oil and Gas Act ("Act 13").[1]  The vertical wells that are the subject of this proceeding utilize the hydraulic fracturing process, colloquially referred to as "fracking," to extract natural gas through a vertical well bore from the underlying geologic formation known as the Marcellus Shale.  At the heart of this dispute is whether an impact fee will be assessed whenever a vertical well's production exceeds an average of 90,000 cubic feet of natural gas per day for *even one month* of the year, or whether the well must exceed this production threshold *in every month* of the year, for the fee to be imposed.  After careful review, we conclude that, under the relevant provisions of Act 13, the impact fee will be imposed on such wells if their production exceeds 90,000 cubic feet of natural gas per day for even one month of the year, as found by the Public Utility Commission ("PUC").  Therefore, we reverse the Commonwealth Court's order, which had reversed the PUC, and we reinstate the PUC's order.

## I. Background

An unconventional natural gas well is defined by Section 2301 of Act 13 as "[a] bore hole drilled or being drilled for the purpose of or to be used for the production of natural gas from an unconventional formation." 58 Pa.C.S. § 2301.  Section 2301 describes an unconventional formation as

> A geological shale formation existing below the base of the Elk Sandstone or its geologic equivalent stratigraphic interval where natural gas generally cannot be produced at economic flow rates or in economic volumes except by vertical or horizontal well bores stimulated by hydraulic fracture treatments or by using multilateral well bores or other techniques to expose more of the formation to the well bore.

58 Pa.C.S. § 2301.  The Marcellus Shale is such an unconventional geologic formation.[2]

---

[1]  58 Pa.C.S. §§ 2301-2318.  These statutory provisions are part of the Act of February 14, 2012, P.L. 87, No. 13, which is more commonly known as "Act 13."

[2]  There are two principal unconventional geological formations underlying the Commonwealth which are rich in natural gas deposits — the Marcellus Shale and the

Structurally, a vertical well, the type of well at issue in this case, is one in which a bore hole is drilled vertically downwards from a point on the land surface until it enters the top of a reservoir of natural gas pooled within an unconventional formation. By contrast, the other type of gas well commonly drilled to extract natural gas — a horizontal well — features a main bore hole drilled vertically downwards from a surface point to the depth of the natural gas reservoir in the formation, with one or more horizontal bore holes branching laterally from the main bore hole into the reservoir. Two or more horizontal bore holes extending laterally from a single vertical bore hole are referred to as multilateral bore holes. Joshi, *PETROLEUM ENGINEERING — UPSTREAM — Horizontal and Multilateral Well Technolog*y at 2, available at www.eolss.net.[3]

Section 2302 of Act 13 provides for the imposition of an impact fee on every producer of natural gas from an unconventional well "spud"[4] in the Commonwealth where authorized by the County or municipality in which the well is located, if the County in which the well is located passes an ordinance authorizing the imposition of such a fee, or 50

---

much larger Utica Shale which lies beneath it. *See* https://geology.com/articles/utica-shale/. Both formations are targets of the majority of the unconventional drilling activity presently taking place in the Commonwealth. http://www.dcnr.pa.gov/Geology/GeologicEconomicResources/OilAndGas/Pages/default.aspx.

Because of the impermeable nature of the rock comprising these formations, it is necessary to stimulate natural gas production from these formations through the use of processes such as fracking. "Hydraulic Fracturing Overview," available at http://files.dep.state.pa.us/OilGas/BOGM/BOGMPortalFiles/MarcellusShale/DEP%20Fracing%20overview.pdf. As our Court has previously explained, the process of fracking involves "pumping at high pressure into the rock formation a mixture of sand and freshwater treated with a gel friction reducer, until the rock cracks, resulting in greater gas mobility." *Robinson Township v. Commonwealth*. 147 A.3d 536, 543 n.4 (Pa. 2016).

[3] EOLSS is an online repository of articles and books written by experts in the fields of the physical and life sciences which was developed by UNESCO (the United Nations Educational, Scientific and Cultural Organization).

[4] Spudding is the term given to "[t]he actual start of drilling of an unconventional gas well." *Id.* at § 2301.

percent of its municipalities pass resolutions authorizing the imposition of such a fee. *Id.* § 2302. A producer of natural gas from a vertical well must pay an impact fee if the well meets Act 13's definition of a "vertical gas well" — *i.e.* –- "[a]n unconventional gas well which utilizes hydraulic fracture treatment through a single vertical well bore and produces natural gas in quantities greater than that of a stripper well." *Id.* § 2301. A "stripper well," in turn, is defined as "an unconventional gas well incapable of producing more than 90,000 cubic feet of gas per day during any calendar month." *Id.*[5] The impact fee on vertical gas wells is 20% of the fee imposed on producers from other unconventional gas wells, and vertical gas wells are exempt from assessment of such fees during their 11th through 15th years of production. *Id.* § 2301, 2302(f).

The impact fees for all unconventional wells are imposed on an annual flat, per-well basis, and calculated using the average annual price of natural gas during the calendar year in which the fee is assessed. *Id.* § 2302. Producers from unconventional wells are responsible under Section 2303 of Act 13 for self-reporting the amount of a well's production for each calendar year and are obligated to remit any impact fees they owe to the PUC, along with a $50.00 per-well administrative fee.

Section 2302 allows a suspension of the operator's obligation to pay the annual impact fee if, within two years of paying the initial impact fee, the well is capped, or, as is implicated by this appeal, the natural gas produced from the well falls below the statutory limit for stripper wells. If, however, gas production from the well once again rises above the stripper well production limit of 90,000 cubic feet per day during a particular calendar year, then, under Section 2302, the impact fee is re-imposed for that calendar year at the same rate as when payment was suspended. *Id.* § 2302(b.1). Once a well has ceased

---

[5] The PUC calculates daily well production as an average, dividing the total amount of gas produced by the well in a calendar month by the number of days in the month. PUC Proposed Rulemaking Order, 10/17/13 at 8, n.14. This method of calculation is not in dispute in this appeal.

production altogether, and has been plugged in accordance with regulations of the Department of Environmental Protection ("DEP"), the producer is no longer required to pay impact fees for the well. *Id.* § 2302(e).

Because it is relevant to our statutory analysis below, we briefly discuss how the General Assembly has structured the disbursement of the impact fees collected by the PUC. The PUC deposits all impact fee payments from producers into an "Unconventional Gas Well Fund" (the "Fund") in the state treasury. *Id.* § 2301, 2314. Under Section 2314 of Act 13, 40% of this fund is reserved for annual fixed distributions by the Commission to: county conservation districts for uses consistent with their statutory mission; the Pennsylvania Fish and Boat Commission for review of drilling permits; the DEP for costs associated with administering Act 13; the Pennsylvania Emergency Management Agency to plan, coordinate, and train for accidents or incidents related to unconventional gas well operations; the Office of State Fire Commissioner for the development of training and funding programs for first responders and the acquisition of specialized equipment to deal with emergencies arising out of natural gas production from unconventional wells; and to the Pennsylvania Department of Transportation for "rail freight assistance." *Id.* at § 2314(c), (c.1), and (c.2).

The remaining 60 percent of the money in the Fund is expressly reserved for counties and municipalities in which such unconventional gas wells are located, and which have authorized the imposition of an impact fee. *Id.* §§ 2302, 2314(d). Counties and municipalities are required to use the monies they receive from the Fund "for the following purposes associated with natural gas production from unconventional gas wells within the county or municipality":

> (1) Construction, reconstruction, maintenance and repair of roadways, bridges and public infrastructure.

(2) Water, storm water and sewer systems, including construction, reconstruction, maintenance and repair.

(3) Emergency preparedness and public safety, including law enforcement and fire services, hazardous material response, 911, equipment acquisition and other services.

(4) Environmental programs, including trails, parks and recreation, open space, flood plain management, conservation districts and agricultural preservation.

(5) Preservation and reclamation of surface and subsurface waters and water supplies.

(6) Tax reductions, including homestead exclusions.

(7) Projects to increase the availability of safe and affordable housing to residents.

(8) Records management, geographic information systems and information technology.

(9) The delivery of social services.

(10) Judicial services.

(11) For deposit into the county or municipality's capital reserve fund if the funds are used solely for a purpose set forth in this subsection.

(12) Career and technical centers for training of workers in the oil and gas industry.

(13) Local or regional planning initiatives under the act of July 31, 1968 (P.L. 805, No. 247), known as the Pennsylvania Municipalities Planning Code.

58 Pa.C.S. § 2314 (g) (footnote omitted).

If money remains in the Fund, after these distributions are made, it is mandatorily transferred to a "Marcellus Legacy Fund," from which 40 percent of the money deposited therein is available to counties to use in repairing or replacing their "at-risk" deteriorated bridges, as well as projects which acquire or maintain lands for "recreational or conservation purposes." *Id.* § 2315.

## II. Factual and Procedural History

Appellee, SBI, drilled, and during the relevant time period covered by this appeal — 2011 and 2012 — operated, a number of unconventional vertical wells in Pennsylvania. After reviewing SBI's annual well production reports for calendar years 2011 and 2012, the PUC's Bureau of Investigation and Enforcement ("I & E") determined that SBI had failed to properly identify on those reports 45 wells as "vertical gas wells," and that SBI failed to remit the requisite impact fees to the PUC for them. In 2014, I & E filed a complaint against SBI, seeking $507,586.00 in past due impact and administrative fees, plus penalties and interest for those wells, as well as requesting that SBI be ordered to pay an additional penalty of $50,000. SBI filed an answer to the complaint, denying liability on the basis of its contention that the wells produced insufficient quantities of gas to qualify as vertical gas wells and were, in fact, stripper wells, and thus exempt from the impact fee.

The matter was assigned for adjudication to PUC Administrative Law Judge ("ALJ") David A. Salapa, who granted leave to intervene to Appellee the Pennsylvania Independent Oil and Gas Association ("PIOGA"), an industry trade association representing oil and gas producers. (Hereinafter, we will refer to SBI and PIOGA collectively as Appellees). In those proceedings, Appellees filed a motion for summary judgment, asserting that Section 2301's definition of stripper well was unambiguous, and that, under its plain language, if an unconventional well produced 90,000 cubic feet per day of gas, or less, *for even a single month* in the annual reporting period, then the well was classified as a stripper well and exempt from the impact fee.

In its response, I & E contended that the term "any" in Section 2301's definition of stripper well, *i.e.*, "incapable of producing more than 90,000 cubic feet of gas per day during any calendar month," was ambiguous in that "any" can mean either "one or another

taken at random," or "every." ALJ Opinion, 2/19/15, at 24. Thus, I & E argued that, because of this ambiguity, it was necessary to resort to the canons of statutory construction enumerated in Section 1921(c) of the Statutory Construction Act ("SCA")[6] in order to properly interpret this definition. In I & E's view, application of these factors yielded the conclusion that the objective of the impact fee provisions of Act 13 was "to provide relief to municipalities affected by unconventional gas wells," and that "this objective would be frustrated by exempting active producing wells from paying fees under Act 13 because their production falls below 90,000 [cubic feet] of gas per day for one month out of twelve." ALJ Opinion, 2/19/15, at 25. The ALJ denied Appellees' motion, but did not enter judgment for I & E, inasmuch as it had not made its own motion for summary judgment.

The ALJ subsequently held a hearing on December 4, 2014, at which he received testimony from a PUC representative as to how the impact fee and attendant penalties were computed for SBI's wells, as well as testimony from the Vice President of SBI in which he related his own understanding of the definition of a stripper well, and admitted his lack of knowledge as to the PUC's contrary interpretation at the time SBI submitted its production reports. Thereafter, on February 19, 2015, the ALJ issued an order sustaining I & E's complaint and its assessment of the back fees, interest, and penalties owed by SBI.

In his opinion accompanying this order, the ALJ framed the central question for his consideration as "whether the gas wells that [SBI] failed to identify in its annual reports to the [PUC] are 'vertical gas wells' subject to Act 13's impact and administrative fees or are 'stripper wells' not subject to Act 13's impact and administrative fees." ALJ Opinion, 2/19/15, at 23. Considering the definition of stripper well in Section 2301, he explained

---

[6] *See infra* at pp. 25-26.

that he found the statutory language to be ambiguous, as evidenced by the fact that the PUC had to issue multiple interpretative orders to explain to producers how the impact fee was to be calculated under Act 13. These successive orders were a tentative "Implementation Order," issued on March 16, 2012, a final Implementation Order issued on May 10, 2012, a "Reconsideration Order" issued on July 19, 2012, a "Clarification Order" issued on December 20, 2012, and a "Proposed Rulemaking Order," issued on October 17, 2013. The ALJ noted that the PUC, in response to producer inquiries, had explained in its Reconsideration Order that, "if a 'vertical gas well' produced more than 90,000 [cubic feet] per day in any calendar month in a calendar year, that well would be subject to the impact fee." ALJ Opinion, 2/19/15, at 26 (quoting PUC Reconsideration Order, 7/19/12, at 5). The ALJ further observed that the PUC had also stated in its Proposed Rulemaking Order that, even if a vertical gas well only produces quantities of natural gas in excess of that of a stripper well for just one month during a calendar year, the impact fee must be paid for the well. The ALJ concluded that the PUC's interpretation of the statute, as set forth in its interpretative orders, was entitled to "great deference," because it is the administrative agency charged by Act 13 with enforcing and administering it. ALJ Opinion, 2/19/15, at 27. Consequently, the ALJ deemed the PUC's interpretation controlling, and, thus, concluded that it supported I & E's assessment of impact fees, interest, and penalties.[7]

---

[7] In his statutory construction analysis, the ALJ rebuffed Appellees' argument that the impact fee provisions of Chapter 23 were in the nature of a tax and, hence, must be construed in their favor. The ALJ found that the impact fee did not constitute a tax, as it did not raise money for the general welfare of the public, or otherwise contribute to the general fund of either the Commonwealth or the affected municipalities.

Appellees next appealed to the PUC, which issued an opinion upholding the ALJ's ruling.[8] Because a vertical gas well subject to assessment of an impact fee is defined by Section 2301 as producing "natural gas in quantities greater than that of a stripper well," 58 Pa.C.S. § 2301, the PUC viewed the dispositive question as to whether a particular unconventional well is subject to assessment of the impact fee as whether or not the well met Section 2301's definition of a stripper well, *i.e.*, did not produce more than 90,000 cubic feet of gas per day in "any calendar month." PUC Opinion, 6/11/15, at 38 (quoting 58 Pa.C.S. § 2301).

The PUC agreed with the ALJ that the term "any" as used in the definition of stripper well was not plain. The PUC observed that, according to Black's Law Dictionary, the term "any" has two meanings, "'all' or 'every' as well as 'some' or 'one.'" *Id.* at 39 (quoting Black's Law Dictionary at 94 (6th ed. 1990)). Thus, the PUC considered the phrase "any calendar month" to be susceptible of two reasonable interpretations: The first, "every calendar month" — I & E's suggested interpretation — would relieve the imposition of the fee only if gas production dropped to or below 90,000 cubic feet per day in *all* calendar months of the reporting year. The second interpretation, offered by SBI and PIOGA — "one calendar month" — would prohibit imposition of the fee if, in just one month out of the year, production dropped to or below the 90,000 cubic foot per day

---

[8] As the PUC is statutorily structured, its investigative and enforcement bureau and its adjudicative division perform separate functions: I & E is tasked with conducting investigations into alleged violations of laws within its jurisdictional purview, and whenever it determines that a violation has occurred, it files a formal complaint which is heard by an ALJ from the PUC's adjudicative division. If the ALJ finds that a violation has occurred, he or she then determines an appropriate penalty. A party aggrieved by the ALJ's decision may appeal it to the PUC Commissioners, who then collectively sit as an administrative tribunal to decide such challenges. 66 Pa.C.S. §§ 331–335; *see also PUC v. Andrew Seder/The Times Leader*, 139 A.3d 165 (Pa. 2016) (discussing the separate roles of I & E and the PUC Commissioners in investigating and adjudicating violations). An order of the PUC disposing of all issues raised in such an appeal is final and appealable as of right to the Commonwealth Court. 66 Pa.C.S. § 316.

production level, even if the well's production exceeded the 90,000 cubic foot per day level in all other months. Because each of these interpretations was reasonable, the PUC determined the use of the term "any" was ambiguous.

The PUC, applying the canons of statutory construction in Section 1921(a) of the SCA,[9] observed that "one of the primary purposes" for the imposition and collection of the impact fee was to provide financial assistance to municipalities in which drilling was taking place, and that, to restrict collection of such fees in circumstances where production dropped below the level in just one month out of the year, would thwart that purpose. *Id.* at 41. Also, the PUC expressed its concern that relieving a producer of having to pay an impact fee based on only one month's reduced production would create an incentive for "unscrupulous producers" to deliberately reduce production at a well during one month of a calendar year to avoid paying the fee for the whole year. *Id.*

Further, the PUC found that a prior version of the bill which ultimately became Act 13 defined a stripper well as being "incapable of producing more than 90,000 [cubic feet] of gas per day during **a** calendar month," a definition which more readily aligns with that proposed by Appellees. *Id.* at 42 (quoting H.B. No. 1950, P.N. 2837 (2011)). However, during the consideration process, the legislature amended this language and replaced "a" with "any" in the final bill which became Act 13. From the PUC's perspective, this indicates that it was not the legislature's intent to grant an exemption from the impact fee based on only one month's reduced production.

Lastly, noting that this interpretation was consistent with that set forth in its previously issued Reconsideration and Proposed Rulemaking Orders, the PUC disputed

---

[9] This provision of the SCA mandates that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921

Appellees' assertion that I and E's interpretation had been developed solely because of the instant litigation, given that these orders were issued long before this litigation began. For all of these reasons, the PUC adopted the decision of the ALJ, with some slight modifications not relevant to the present appeal, and ordered SBI to pay $390,250 in impact and administrative fees for 2011 and 2012, as well as $11,707.50 in interest and $97,562.50 in penalties for those years — a cumulative total of $499,520. Appellees appealed this order to the Commonwealth Court.

The Commonwealth Court, sitting *en banc*, reversed in a split, published decision.[10] *Snyder Brothers v. PUC*, 157 A.3d 1018 (Pa. Cmwlth 2017) (*en banc*). The majority acknowledged that "any" has a multiplicity of dictionary meanings, including those set forth in Webster's Dictionary, which defines "any" as "(1) one: or (2) one, some, or all regardless of quantity; (3) one or more; (4) great, unmeasured or unlimited in amount; and (5) all." *Id.* at 1023 (quoting *Webster's Third New International Dictionary* 97 (1976)). Nevertheless the court found the term "any" as used in the phrase "any month" in the definition of stripper well to be unambiguous. According to the majority, the fact that, under Act 13, the impact fee is assessed per calendar year, the most natural reading of "any" in this context is that it means at least one month out of the calendar year. The majority further noted that, as used in the definition of stripper well, "any" modified a singular noun — month — thus, in accordance with grammatical rules, it took on the singular definition of the noun it was modifying and must mean "only one or a singular month." 157 A.3d at 1024.

---

[10] Judge McCullough wrote the majority opinion which was joined by President Judge Leavitt, and Judges Simpson, Brobson and Hearthway. Judge Wojcik authored a dissenting opinion joined by Judge Cosgrove. For reasons not apparent of record, this matter was originally argued before the Commonwealth Court on November 18, 2015; however, that court did not issue a decision thereafter. The matter was re-argued on February 18, 2017, after which the court issued the opinion and order under review in this matter.

The majority found support for this conclusion in *Commonwealth v. Davidson*, 938 A.2d 198 (Pa. 2007), in which this Court addressed the question of whether a statute criminalizing the possession of various media containing images of child pornography penalized the possession of each image separately, or all of the images as a whole. The statute at issue provided that the law is violated by a person who "knowingly possesses or controls any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material" which depicts a minor "engaging in a prohibited sexual act or in the simulation of such act." *Davidson*, 938 A.2d at 218-19. Our Court found that the use of the term "any" meant without restriction or limitation; however, because the enumeration of the objects in the statute, *i.e.*, photograph, computer depiction etc., were all singular in nature, we concluded that this plain language made each separate act of possession of an image appearing in those formats a criminal offense. The Commonwealth Court herein reasoned that the presence of singular nouns in the definition of stripper well likewise supported ascribing to the term "any" its singular meaning — *i.e.*, "one." So, having found the phrase "incapable of producing more than 90,000 cubic feet of gas per day during any calendar month" plain and unambiguous, the court ruled that, whenever a gas well cannot produce more than 90,000 cubic feet per day in any one month of a calendar year, it must be classified as a stripper well for that year, and therefore is not subject to annual impact fees.

In arriving at this conclusion, the majority rejected the PUC's argument that its interpretation was consistent with the provision in Act 13 governing when a "restimulated" well[11] was subject to an impact fee under Section 2302(d) of Act 13, 58 Pa.C.S. § 2302(d). That section provides, in relevant part, that a restimulated well is subject to an impact fee

---

[11] A restimulated unconventional gas well is a natural gas well eleven years old or more, which experiences a "substantial increase in production" through the use of hydraulic fracturing, drilling of additional multilateral well bores, extension of a vertical bore hole to greater depths, or other production stimulation techniques. 58 Pa.C.S. § 2302(d).

for a "substantial increase in production" which it defines as "an increase in production amounting to more than 90,000 cubic feet of gas per day during **a** calendar month." 58 Pa.C.S. § 2302(d)(3) (emphasis supplied). The majority did not accept the PUC's argument that this provision indicated the legislature intended that any well which has production in excess of 90,000 cubic feet of gas per day for even one calendar month is subject to the impact fee. The majority reasoned that fees for restimulated wells were "a unique brand of fees that are separate and distinct" from impact fees for vertical unconventional gas wells. *Snyder Brothers*, 157 A.3d at 1025.[12]

Although the majority expressed confidence in its plain meaning interpretation, it conceded that the interpretation offered by the PUC was "at the very least, reasonable." *Id.* at 1026. Thus, the majority proceeded to engage in its own statutory construction analysis, discounting all of the factors cited by the PUC in its analysis. First, the majority afforded no credence to the PUC's concern that, were Appellees' proffered interpretation adopted, well operators could avoid payment of the fee by simply reducing production in just a single month of a calendar year. The majority found no evidence of record that SBI had ever engaged in such manipulation of well production output. The majority then seemingly questioned the notion of whether any well operators would ever engage in such conduct. The majority suggested that such manipulation if it were to occur, would result in civil fines and penalties.

The majority also rejected the notion that the desire to collect more impact fees for the government was a legitimate basis for liberally construing the statute in the manner employed by the PUC. The majority noted that counties and municipalities were not intended to be the primary beneficiaries of the impact fee as they were only fifth in line to

---

[12] As explained, *infra*, this was an incorrect interpretation of Act 13, inasmuch as there is only one impact fee for all types of unconventional gas wells. *See infra* note 24.

receive money from the impact fees, so it characterized them as mere "incidental" beneficiaries. *Id.* at 1027.[13] The majority furthermore suggested that a county, in order to receive revenue from unconventional gas wells, was free to impose its own fees on such wells in an amount equivalent to the assessments payable to the PUC provided for Section 3202.[14] Additionally, the majority discounted the importance of the change in language from "a" to "any" from an earlier version of the bill, due to the absence of any legislative history explaining the reason for the change.

Further, the majority gave scant weight to the PUC's interpretation in its Proposed Rulemaking Order, as, in its view, that order was specifically defining the criteria for vertical gas wells, not stripper wells, and offered "no clarification or meaningful distinction between a vertical gas well and a stripper well." *Id.* at 1028 n.15. Consequently, the majority viewed the PUC's interpretation as one which was developed as a result of the instant litigation, not as part of the rulemaking process, and thus was not entitled to great deference.

Finally, the majority observed that, because civil penalties may be imposed under Act 13 for failure to pay the impact fee — up to 25 percent of the amount owed — this rendered the statute penal in nature. Thus, because the definitions of stripper well and vertical gas well were, in its view, vague and without meaningful distinction, the majority considered it necessary to apply the rule of lenity and strictly construe these definitions in

---

[13] As the PUC highlights, *see* PUC Brief at 25, and as we discuss at greater length *infra*, this was a grievous minimization of the degree of benefit counties and municipalities realize from the amount of impact fees collected, given that both are entitled to the majority of money — 60 percent — remaining in the Fund after distributions to conservation districts and state agencies, and as an additional 40% of the funds in the Marcellus Legacy Fund is dedicated to county bridge and recreational projects. 58 Pa.C.S. §§ 2314 & 2315.

[14] This too was an incorrect interpretation of Act 13 by the Commonwealth Court, as the parties agree that neither counties nor municipalities are authorized by Act 13 to collect separate impact fees payable to them.

favor of SBI, so as to avoid finding them unconstitutionally void for vagueness. For all of these reasons, the majority concluded that the term "any" meant "one" and not "all" or "every," and it reversed the Commission's order finding SBI in violation for failing to pay impact fees on the wells at issue.

Judge Wojcik, joined by Judge Cosgrove, filed a dissenting opinion. The dissent agreed with the PUC's interpretation of the statute, based on that body's application of the principles of statutory construction. Like the PUC, the dissent found it significant that the word "a" appearing in an earlier version of the definition of stripper well in a prior version of Act 13 considered by the General Assembly was replaced by "any" in the final version of the bill that was passed, and, thus, indicated that the PUC's interpretation was consistent with legislative intent. The dissent found persuasive the PUC's concern that adopting Appellees' suggested construction would hinder the assessment of impact fees which would, in turn, thwart the primary legislative purpose of imposing such fees, which the dissent perceived as giving "relief to municipalities affected by unconventional gas drilling." *Id.* at 1031. The dissent agreed with the PUC that Appellees' suggested construction gave drillers an incentive to deliberately reduce production levels in one month in order to avoid paying impact fees for the entire calendar year.

Lastly, the dissent rejected the argument that the statute should be strictly construed in favor of drillers, because, in the dissent's view, the legislative intent in enacting the statute could be determined by application of the principles of statutory construction, particularly the canon which requires substantial deference to the interpretation afforded the statute by the administrative agency which has the responsibility of enforcing it. Consequently, the dissent considered the PUC's prior interpretations set forth in its interpretative orders as entitled to great weight, which

deference, in the dissent's view, the majority failed to exercise; hence, the dissent would have upheld the PUC's order and the attendant interest and penalties it imposed.

The PUC petitioned for allowance of appeal, asserting that the Commonwealth Court's finding that the definition of stripper well in Section 2301 was clear and unambiguous was erroneous, and, also, that the court's alternative statutory construction analysis was likewise in error. We granted the petition for allowance of appeal,[15] heard oral argument from the parties on April 11, 2018, and we now address both of the PUC's challenges.

### III. Arguments of the Parties

The PUC argues the Commonwealth Court erred by finding that the definition of stripper well was clear and unambiguous, particularly since that court acknowledged that the term "any" had a multiplicity of dictionary meanings, one of which was singular, and one which was plural. Further, the PUC observes that the Commonwealth Court's conclusion is undercut by the fact that it took two years and two *en banc* oral arguments to decide this question, and as it engaged in an alternative ambiguity analysis in its opinion, which suggests it was not certain about its plain meaning approach. The PUC reiterates its view that the use of the term "any" is ambiguous and, thus, that statutory construction is warranted to choose which of the two arguably reasonable interpretations of that term is the correct one.

The PUC contends that the Commonwealth Court misread the provisions of Act 13. It disputes the Commonwealth Court's conclusion that Section 2302(d)(3) of Act 13, governing impact fees for restimulated wells, is irrelevant in determining whether these wells are subject to an impact fee. The PUC underscores that there is no separate "re-stimulation fee," as the Commonwealth Court concluded, but rather only one impact fee

---

[15] *See Snyder Brothers v. PUC*, 172 A.3d 1119 (Pa. 2017) (order filed October 18, 2017).

imposed on all unconventional gas wells that reach specified production levels. The PUC argues that, because Section 2302(d)(3) requires that an impact fee be assessed in the event that a restimulated well exceeds "90,000 cubic feet of gas per day during a calendar month," PUC Brief at 19 (quoting 58 Pa.C.S. § 2302(d)(3)), this supports the conclusion that the legislature, as a general matter, conceived of the impact fee as payable for all wells that produce natural gas in an amount exceeding 90,000 cubic feet of gas a day in a single month of the calendar year. The PUC asserts that its construction of the definition of a stripper well is consistent with the legislative intent behind the imposition of the fee, namely, "to mitigate damages due to gas drilling and production, which damages accrue regardless of the ultimate productivity of a particular well." PUC Brief at 19-20.

Next, the PUC points out the Commonwealth Court's interpretation of these sections lead to an absurd and unreasonable result in practice, since, under this interpretation, a well producing, for example, 100,000 cubic feet for every month of a calendar year must pay the fee, whereas a well producing 200,000 cubic feet of gas a day in every month of the year but one, for which production decreases to 90,000 cubic feet of gas a day, would evade payment of the fee, even though the second well's total yearly production would be nearly two times greater than that of the first well. The PUC concludes that all of these factors establish that the language in question is far from clear and unambiguous.

The PUC next assails the Commonwealth Court's application of the relevant statutory construction factors in Section 1921(c) of the SCA. First, the PUC emphasizes that the Commonwealth Court erred in concluding that counties and municipalities may impose their own separate assessments on gas wells, as Act 13 allows the imposition of only one impact fee, which is collected and disbursed by the PUC, and the Act contains no provision allowing counties and municipalities to impose their own additional fees.

Consequently, there is no alternate source of revenue for the counties and municipalities from drilling activities within their borders.

Indeed, in the PUC's view, this initial erroneous assumption — that the counties and municipalities had the ability to impose their own fees — was the source of the Commonwealth Court's subsequent faulty conclusion that the PUC's statutory construction did not further the primary purpose of its enactment: providing counties and municipalities financial relief to offset the impacts of drilling. The PUC disputes the Commonwealth Court's conclusion that counties and municipalities can be considered merely "incidental beneficiaries" of the impact fee. PUC Brief at 25 (quoting *Snyder Brothers*, 157 A.3d at 1027). The PUC points out that municipalities are entitled to 60% of all revenue remaining in the Fund after the statutorily required fixed disbursements are made to conservation districts and state agencies. Moreover, municipalities may also apply to receive monies from the remaining 40% of the non-disbursed impact fee revenue, which is deposited into the Marcellus Legacy Fund to ameliorate the effects of drilling in their communities.

The PUC also decries the Commonwealth Court's disregard of the change in statutory text as this legislation was being considered, noting that one does not need accompanying legislative history to recognize that a change from "a" to "any" in the definition of stripper well had significance, in and of itself, because it clearly signified that the legislature intended to require well production to drop below the 90,000 cubic foot level in more than a single month in order for it to be classified as a stripper well.

Additionally, the PUC argues that the Commonwealth Court improperly characterized Act 13 as a penal statute because of its provisions imposing a fine for failure to pay the impact fee. The PUC asserts that the fines and other penalty provisions, *see* 58 Pa.C.S. §§ 2308–2310, are merely enforcement mechanisms to ensure the timely

payment of the impact fees by producers, and, therefore, are wholly separate from the portion of the statute at issue in the present case, which sets forth the mechanism for assessment of the fee; hence, the application of the rule of lenity is inapplicable to interpretation of these non-penal provisions. The PUC further notes that, while taxing statutes are to be strictly construed in favor of the taxpayer, this presumption is not applied until all other efforts at statutory construction have proven fruitless; thus, even if the impact fee were to be considered a taxing statute, its use of the term "any" can be readily interpreted using the rules of statutory construction without resort to this presumption.

The PUC asserts, however, that the presumption that the legislature did not intend an absurd or unreasonable result in enacting a statute *is* applicable in conducting a proper statutory construction analysis in this matter. The PUC contends that, based on the same reasons discussed in the first part of its brief, its construction avoids the absurd and unreasonable outcome where a producer is able to avoid paying the fee for a well for an entire year based on only one month's reduced production from the well. In the PUC's view, the Commonwealth Court's interpretation, by contrast, would constitute an inducement for operators to manipulate well production so as to avoid payment of the impact fee.

Lastly, the PUC maintains that the Commonwealth Court failed to accord the agency's interpretation the requisite degree of deference to which it was entitled, as it is the administrative agency charged with the interpretation and application of the statute, and its interpretation is not clearly erroneous. The PUC disputes the Commonwealth Court's conclusion that it "flip flopped" on the question of what level of production is required for payment of the impact fee, observing that, in 2012 when it first had to interpret the statute and collect the fee, it stated in its Reconsideration Order that, if a vertical gas well exceeded the 90,000 cubic feet of gas per day production level in one month of a

calendar year, then it was subject to the yearly impact fee, and it continued to adhere to this interpretation in its 2013 Implementation Order. Further, the PUC denies that it developed this interpretation in anticipation of litigation, noting that its interpretative orders were promulgated far in advance of the litigation. The PUC asserts that, because its interpretation was reasonable, it was entitled to deference and the Commonwealth Court overstepped its role in disregarding this interpretation. The PUC reminds that our Court has consistently reversed the Commonwealth Court for failing to accord administrative agencies the proper degree of deference in interpreting the statutes they are charged with administering.

In response, SBI contends the term "any" as used in the definition of stripper well is clear and unambiguous and means "one," as the Commonwealth Court found. SBI argues that this interpretation is in accord with its common and approved usage, and, thus, the Commonwealth Court properly read the statute as classifying a well as a stripper well if its production falls to or below a daily average of 90,000 cubic feet of gas in "any one month." SBI asserts that, if the legislature intended to require the well be incapable of producing more than 90,000 cubic feet of gas per day in all months of a calendar year in order to be exempt, it would have used more precise language, such as "every month," "each month," or "all months." SBI Brief at 11. SBI claims that the PUC is, in essence, interpreting this statutory language to create a presumption that, because a well is capable of exceeding the statutory production cap of 90,000 cubic feet of gas per day in one month of a calendar year, it is capable of doing so in all months. SBI contends there is no predicate factual basis for such an assertion. SBI argues that what the PUC is really doing with its proffered interpretation is attempting to broaden the scope of the definition of a stripper well in order to make more wells subject to the impact fee, and, thus, maximize the amount of revenue it is collecting on behalf of counties and municipalities.

SBI next argues that, even were our Court to consider the term "any" to be ambiguous, application of the rules of statutory construction yields the same conclusion that the definition of "any" means one. First, SBI contends that, because Section 2308(b) of Act 13 imposes substantial penalties on producers who fail to pay the impact fee, it is a penal statute and thus should be narrowly construed under the rule of lenity. SBI renews its prior contention, made before the ALJ and PUC, but not addressed by the Commonwealth Court, that the impact fee is actually a tax, despite not being labelled as such, and, as a result, its terms should be construed in SBI's favor under Section 1928(b)(3) of the SCA, which requires strict construction of statutory "[p]rovisions imposing taxes." 1 Pa.C.S. § 1928(b)(3). SBI argues that, because the impact fee is a revenue producing measure which generates a large amount of money for counties, and is disproportionately greater than the costs incurred in collection and supervision fees incurred by the PUC in its collection, it must be considered a tax. Additionally, SBI maintains that, because the greatest bulk of the revenue generated by the impact fee is used for a multiplicity of purposes unrelated to defraying the costs incurred by the PUC's regulation of unconventional gas drilling, including possibly the reduction of other taxes, such uses further support the conclusion that the impact fee is really a tax in another guise.

Finally, SBI claims that the PUC's interpretation of the term "any" is entitled to no deference since the Commonwealth Court's interpretation tracks the plain meaning of the term as used in the statute. Moreover, in SBI's view, the PUC's related administrative orders were not enacted according to formal rulemaking procedures which require public notice, the opportunity for public comment, and review of those comments by the Attorney

General and the Independent Regulatory Review Commission.[16] Therefore, as mere "non-legislative rules," or agency "pronouncements," they are not entitled to the "particularly high measure of deference" as rules which are the product of the formal rulemaking process. SBI Brief at 24 (quoting *Northwestern Youth Services v. DPW*, 66 A.3d 301, 310-311 (Pa. 2013)). SBI further avers that the PUC's current definition of "any" was developed in response to this litigation, and is at odds with its prior view that "any" meant one, which it took in its prior Proposed Rulemaking Order. SBI notes that, in that order, the PUC interpreted the term "any" as having a singular meaning in discussing when an unconventional well is a vertical gas well — namely, if well production exceeds 90,000 cubic feet of gas per day in any month.

In its response to the PUC, PIOGA argues that the meaning of the term "any" must be determined by the context in which it is used in Act 13's definition of stripper well, and when that context is considered, it was clearly meant to have a singular meaning. PIOGA discounts the PUC's reliance on the multiple meanings ascribed to this word enumerated in the dictionary, as, in its view, this means nothing, arguing that, merely because a word is capable of multiple meanings does not indicate that it *must* have alternative meanings. PIOGA contends that, because the meaning of the term "any" as used in the stripper well definition is clear, the Commonwealth Court's ambiguity analysis is superfluous *dicta* which this Court should strike, particularly since PIOGA agrees with the PUC that the Commonwealth Court's opinion erroneously stated that counties may independently impose their own fees at the local level.

PIOGA, however, agrees with the Commonwealth Court that maximizing revenue to governmental bodies is not an acceptable statutory construction factor. It also argues

---

[16] *See* Commonwealth Documents Law, 45 P.S. §§ 1102–1602, and 45 Pa.C.S. §§ 501–907; Regulatory Review Act, 71 P.S. §§ 745.1–745.14; and the Commonwealth Attorneys Act, 71 P.S. §§ 732–101 to 732–506.

that, because there was no explanation from the General Assembly as to why the word "a" in the earlier form of this legislation was changed to "any", this change may not be considered relevant legislative history. PIOGA Brief at 19.

PIOGA further attacks PUC's reliance on its prior interpretative orders to furnish a suitable definition of "any", due to the fact that, in those orders, the PUC was not interpreting the definition of a stripper well, but, rather, was setting forth the production levels required for vertical gas wells to be subject to the impact fee. PIOGA asserts that the PUC gave the term "any" its singular meaning in that context by declaring that, if a vertical gas well produces more than 90,000 cubic feet of gas per day in any single calendar month of the reporting year, it will be subject to the fee for that year. PIOGA argues that PUC cannot have it both ways by stating in its orders that a vertical well is subject to the impact fee if in any month the production exceeds 90,000 cubic feet of gas a day, which assigns to "any" its singular meaning, while at the same time arguing that, for a well to be classified as a stripper well, its production must fall below the 90,000 cubic feet of gas a day cap in every month of the calendar year, giving "any" a plural meaning. PIOGA asserts that both interpretations cannot be correct. PIOGA also contends that the PUC's interpretation is not entitled to deference inasmuch as this is a purely legal question of statutory interpretation, an area in which the PUC has no special expertise.[17]

_____

[17] Senator Joseph Scarnati, the President Pro Tempore of the Pennsylvania Senate who served on the House/Senate Conference Committee which produced the final version of the legislation that became Act 13, H.B. 1950, P.N. 3048, and Senator E. Eugene Yaw, a member of the Senate Environmental Resources and Energy Committee when H.B. 1950 was being considered, have filed a joint *amicus* brief in support of the arguments of SBI and PIOGA. They argue that the entire legislative history of Act 13 needs to be examined in order to discern the legislative intent. They point out that earlier versions of this legislation contained no definition of a stripper well; rather, those bills referred only to a "nonproducing well," and defined such a well as "[a] natural gas well that produces an average of less than 90,000 cubic feet of natural gas per day during a calendar year." Amicus Brief at 3, 6. *Amici* highlight the fact that the final version of this legislation, in which the term "nonproducing well" was changed to "stripper well," also altered the

## IV. Analysis

Because issues of statutory interpretation are questions of law, our standard of review is *de novo,* and our scope of review is plenary. *SEPTA v. City of Philadelphia*, 101 A.3d 79, 87 (Pa. 2014). It is axiomatic that, "if the General Assembly defines words that are used in a statute, those definitions are binding." *PUC v. Andrew Seder/The Times Leader*, 139 A.3d 165, 173 (Pa. 2016). Our interpretation of the relevant definitional language at issue in this case is guided by the precepts of the SCA, 1 Pa.C.S. §§ 1501–1991. Pursuant to the SCA, the overriding object of all statutory interpretation and construction "is to ascertain and effectuate the intention of the General Assembly" in enacting the statute under review. 1 Pa.C.S. § 1921(a). Correspondingly, we are required to interpret or construe a statute so as to give effect to all of its provisions, "if possible." *Id.* If statutory language is "clear and free from ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Thus, when the words of a statute have a plain and unambiguous meaning, it is this meaning which is the paramount indicator of legislative intent.

However, in situations where the words of a statute "are not explicit," the legislature's intent may be determined by considering any of the factors enumerated in Section 1921(c). *DEP v. Cumberland Coal*, 102 A.3d 962, 975 (Pa. 2014). These factors are:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

---

relevant production time frame from "a calendar year" to "any calendar month." This fact, in their view, signifies the legislature's intent to allow waiver of the fee whenever there is a drop in well production of natural gas below 90,000 cubic feet in any given month, and not to require that production drop below that level for the entirety of an entire calendar year as in the prior legislation.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

Further, the SCA establishes specific presumptions applicable to the interpretation and construction of all statutes which are aids in determining legislative intent. Three of these presumptions are apposite to the case at bar: (1) "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," (2) "the General Assembly intends the entire statute to be effective and certain," and (3) "the General Assembly intends to favor the public interest as against any private interest." 1 Pa.C.S. § 1922(1),(2), and (5).

We begin by noting that, despite the parties' and the Commonwealth Court's primary focus in their arguments on the proper interpretation of the definition of "stripper well" in Section 2301, it is not that definition, standing alone, which is dispositive of the central question in this case. As recognized by the ALJ in this matter, the fundamental issue raised by I & E's investigation and complaint, and which was the subject of his adjudication that triggered the subsequent appellate proceedings below, was "whether the gas wells that [SBI] failed to identify in its annual reports to the Commission are 'vertical gas wells' subject to Act 13's impact and administrative fees or are 'stripper wells' not subject to Act 13's impact and administrative fees." ALJ Opinion, 2/19/15, at 23. Consequently, the pivotal question presented by this appeal remains whether the 45 unconventional vertical wells at issue meet Section 2301's definition of "vertical gas well," as alleged by the PUC, and are subject to the assessment of an impact fee; thus, it is the

definition of "stripper well," *as it has been incorporated and utilized in the definition of "vertical gas well,"* which is controlling of our resolution of this question.

As noted, Section 2301 defines a "vertical gas well" as "an unconventional gas well which . . . produces natural gas in quantities *greater* than that of a stripper well." 58 Pa.C.S. § 2301 (emphasis added). A "stripper well," in turn, is "an unconventional gas well incapable of producing more than 90,000 cubic feet of gas per day during any calendar month." *Id.* Accordingly, in order for SBI's wells to have qualified as vertical gas wells during the calendar years 2011 and 2012, they must have produced natural gas in excess of the production ceiling which categorizes a well as a stripper well — in other words, they must have produced "more than 90,000 cubic feet of gas per day during any calendar month."[18] *Id.* In making the determination of whether the wells in question exceeded this production level, we are required to interpret the word "any" as used in the relevant production time frame — namely, "any calendar month."

The word "any," which is not otherwise defined by Act 13, nor by the SCA,[19] has two commonly accepted alternative meanings in the English language which are diametrically opposed. Black's Law Dictionary recognizes this "diversity of meaning," which is dependent on the context in which "any" is used in a statute, as well as the statute's overarching subject; thus, "any" could mean "'all' or 'every,' as well as 'one.'" *Black's Law Dictionary* 94 (6th ed. 1991). This definitional dichotomy is also recognized

---

[18] While we set forth this definition as focused on a well's actual production, we recognize, as noted above, that "stripper well" is defined more broadly, in terms of the *capability* to produce, not merely actual production. Nevertheless, given the issue before us, this distinction is not relevant. Specifically, to the point raised by the dissent, *see* Dissenting Opinion (Mundy, J.) at 4-5, we find nothing about the peculiarities of the stated threshold – here, "incapable of producing more than 90,000 cubic feet of gas per day" – that affects our interpretation of "any" in "any calendar month". Accordingly, and in line with the parties' arguments and the factual basis for the PUC's determination, we will discuss the matter with regard to a well's actual production.

[19] *See* 1 Pa.C.S. § 1991 (providing definitions for select words when they appear in any statute enacted after September 1, 1937).

by dictionaries of the English Language. *See Webster's New Universal Unabridged Dictionary* 96 (2001) (defining "any" as "one," and, alternatively, as "every," or "all"); *The American Heritage Dictionary* 117 (2nd. coll. ed. 1982) (enumerating varying definitions of "any" to include "one or another without restriction or exception," or "[t]he whole amount of; all").

Our Court's jurisprudence has also held that the term "any" can have either of these two divergent meanings, depending on how it is used in a particular statute. *Compare Commonwealth v. Heller*, 67 A. 925, 926 (Pa. 1907) (interpreting terms "any city" in statutory enactment which enabled cities of the third class which owned water, gas, or electrical facilities to establish a department for the provision of these services to their citizens, as referring to individual third class cities which met this ownership criteria, not all third class cities which have such facilities within their borders; "'any city' . . . primarily refers to cities individually. It may include all, but does not necessarily do so.") *with In re Estate of Belefski*, 196 A.2d 850, 851, 855 (Pa. 1964) (holding that statute which provided that amounts payable from Commonwealth Retirement Fund for public employees were "exempt from any State or municipal tax," included all taxes such as the Pennsylvania inheritance tax; "[t]he word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive."). Thus, we consider the meaning of the term "any" to be wholly dependent on the context in which it is used in the particular statute under review. *See generally In re Estate of Wilner*, 142 A.3d 796, 804-05 (Pa. 2016) ("[L]egislative words are to be read in their context and not in isolation."); *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1201 (Pa. 2001) (same); *accord Heller Benat v. Mutual Benefit Health & Accident Association,* 159 A.2d 23, 25 (Pa. Super. 1960) ("[T]he word 'any' is not susceptible of a categorical definition meaning 'all' or 'every' . . . The significance of the word 'any' is discoverable in its context."), *affirmed on the basis of the*

*Superior Court opinion*, *Benat v. Mutual Benefit Health & Accident Association*, 166 A.2d 880 (Pa. 1961).

If a statutory term, when read in context with the overall statutory framework in which it appears, has at least two reasonable interpretations, then the term is ambiguous. *A.S. v. Pennsylvania State Police*, 143 A.3d 896, 906 (Pa. 2016).  Because the alternative definitions of "any" are equally plausible, and as neither is absurd or unreasonable on its face, we find that "any," as used in this context, is ambiguous.  *Trust Under Agreement of Taylor*, 164 A.3d 1147, 1156 (Pa. 2017); *see also McGrath v. Bureau of Professional & Occupational Affairs, State Board of Nursing*, 173 A.3d 656, 662 n. 8 (Pa. 2017) ("[T]he 'not explicit' prerequisite of [1 Pa.C.S. 1921(c)] logically applies where . . . *any* reading of the statute's plain text raises non-trivial interpretive difficulties." (emphasis original)).  Hence, we resort to the statutory construction factors enumerated in Section 1921(c) of the SCA is necessary to determine the proper construction of this term.

Turning to these factors, we first find "[t]he occasion and necessity for the statute;" the circumstances under which it was enacted;" and "the object to be attained," as well as the legislative history of Act 13, to be particularly helpful in discerning the relevant legislative intent behind the enactment of the impact fee.  1 Pa.C.S. § 1921(1), (2), (4), and (7).[20]

---

[20]  Although Appellees argue that the impact fee provisions of Act 13 are a tax, and, thus, should be strictly construed in their favor pursuant to Section 1928(3) of the SCA, we disagree.  First, the General Assembly deliberately avoided labeling the impact fee as a tax, and, indeed, imposed this fee in *lieu* of a severance tax, which opponents of the legislation had advocated for, and, during the floor debate prior to final passage of Act 13, specifically decried the omission therefrom.  *See*, *e.g.*, House Legislative Journal 164-168, 192-93, 196, 199 (February 8, 2012).  Further counseling against treatment of Chapter 23's impact fee provisions as a tax is the fact that Chapter 23 contains a sunset provision which states that "upon the imposition of a severance tax on unconventional gas wells in this Commonwealth" the Secretary of the Commonwealth shall publish notice of the imposition of such a tax in the Pennsylvania Bulletin; whereupon, all of the impact

Contrary to the characterization of the Commonwealth Court, counties and municipalities are no mere "incidental" beneficiaries of the impact fee. Rather, as the legislative history and statutory structure of this provision demonstrates, they are the *primary* intended beneficiaries of this fee. As our Court has previously observed, the process of drilling and operating an unconventional gas well utilizing the fracking process — an industrial land use — has significant effects on the communities in which it occurs. In *Robinson Township v. Commonwealth*, 83 A.3d 901, 979 (Pa. 2013), a plurality of our Court noted that communities in which such well drilling and extraction occur suffer "environmental and habitability costs associated with this particular industrial use: air, water, and soil pollution; persistent noise, lighting, and heavy vehicle traffic; and the building of facilities incongruous with the surrounding landscape." Justice Baer, concurring separately in that seminal case, also detailed the significant deleterious aspects of the various activities attendant to unconventional well drilling and operation: "these industrial-like operations include blasting of rock and other material, noise from the running of diesel engines, sometimes nonstop for days, traffic from construction vehicles, tankers, and other heavy-duty machinery, the storage of hazardous materials, constant

---

fee provisions contained in Chapter 23 expire. 58 Pa.C.S. § 2318. No such notice has, to date, been published.

Even assuming *arguendo* that the statute establishing the impact fee constitutes a tax, this fact alone would not require us to automatically strictly construe it. In *Dechert L.L.P. v. Commonwealth of Pennsylvania*, 998 A.2d 575, 584 n.8 (Pa. 2010), we repudiated the contention that our Court must always give a taxing statute the narrowest possible construction, as such a constrictive reading may not effectuate the legislative intent behind its enactment. It is only after all efforts at statutory construction "yield no definitive conclusion," that we will read a taxing statute in this fashion. *Id.* As explained in greater detail *infra*, such efforts do lead to a definitive conclusion as to the meaning of the impact fee provisions at issue; hence, we find resort to this presumption would be unnecessary, even if we considered the impact fee to be a *de facto* tax.

bright lighting at night, and the potential for life-and property-threatening explosions and gas well blowouts." *Id. at* 1005 (Baer, J., concurring).

The legislative debates which occurred during the adoption of Act 13 indicate the General Assembly was cognizant of how the myriad activities associated with the drilling and production operations of unconventional gas wells would have negative repercussions on a municipality's physical infrastructure, thereby causing their governments to incur increased costs to maintain or upgrade that infrastructure, as well as necessitate that those bodies make added expenditures for the provision of public services to protect the health, safety, and welfare of their populace. Statements made by proponents of the impact fee provisions of Act 13 during these debates highlight the fact that the impact fee was specifically intended to enable local municipalities to ameliorate these effects.

As then-Representative now Speaker Turzai, a leading sponsor of this measure, eloquently observed:

> Through the impact fee, in the first year alone, $190 million is going to be taken and returned to our local communities for the impacts that occur. By year 5, it will be $400 million annually. And in the first 10 years, it is $3 billion.
>
> * * *
>
> Impact fees generally, and this one in particular, are used to provide for a number of uncompensated costs currently being absorbed by local communities in the State. These include the ability to fund upgrades to affected roads and bridges, water and sewer systems, which are being strained, admittedly by increased usage.
>
> * * *
>
> Another important feature tied to the impacts is the fact that as the price of natural gas rises, this will likely equal additional drilling, which will, in turn, mean higher impacts to address. So there should be more revenues to address those higher impacts. The sliding-scale approach, based on the per Mcf

(1,000 cubic feet) development of the natural gas, is a commonsense mechanism. It is still an impact fee nonetheless.

It is also important to note that impact fees differ in that they are historically authorized through a State's authority to protect the health, welfare, and safety of its citizens, and that is exactly what we are doing in this prime legislation. The impact fee we are addressing is designed to provide for infrastructure improvements based upon direct impacts, which have created a strain throughout the State, and to provide services that are vital to the health, welfare, and safety of each and every Pennsylvania citizen.

*House Legislative Journal* 210-11 (Feb. 8, 2012); s*ee also id.* at 208 (Remarks by Representative Reed, a cosponsor of Act 13) (noting that the first key component of the conference committee report which became Act 13 was the impact fee "that over the next decade will bring $3 billion to our local communities across this Commonwealth *to offset the impacts of the industry on our citizens*" (emphasis added)).[21][22]

---

[21] It is for this reason that we must reject Appellees' argument that, because Chapter 23 imposes monetary and other penalties for non-payment of an impact fee assessment, it is a penal statute which must be strictly construed. The penalty provisions of Chapter 23, 58 Pa.C.S. §§ 2308–2310, are imposed only if a producer fails to pay the required impact fee. Inasmuch as the chief purpose of the impact fee provisions of Chapter 23 is to help municipalities offset the adverse effects of the production of natural gas from unconventional wells within their borders, these provisions are remedial in nature. Because the separate penalty provisions are merely the means by which these remedial measures are enforced, strict construction of the impact fee provisions is not required. *See O'Rourke*, 778 A.2d at 1203 n. 11 (penalty provisions for violations of the Whistleblower Law did not render the law penal in nature, due to the fact that they were "secondary to — and supportive of — the primary purpose of the statute" which was remedial); *see generally Verona v. Schenley Farms Co.*, 167 A. 317, 320 (Pa. 1933) ("[T]here is no impropriety in putting a literal construction on a penal clause, and a liberal construction on a remedial clause in the same statute.").

[22] In our review of this legislative history, we do not find the change in language from "a calendar year" in the earlier versions of this legislation defining a "nonproducing well" to "any calendar month" in the final version defining a "stripper well," *see supra* note 17, probative of the General Assembly's intent, due to the lack of accompanying contemporaneous explanation in the committee report, and the lack of exploration of the reason for this change in the floor debate over the final version of H.B. 1950 which became Act 13.

Accordingly, the General Assembly structured the impact fee in a manner to ensure that it would provide counties and municipalities with a sufficient revenue stream to meet their additional drilling-related needs by making these governmental entities the primary recipients of the monies the PUC collects through the fee. As noted by the PUC, counties and municipalities are entitled to the largest portion of the monies which this fee generates, given that they are allocated 60% of the revenues paid by producers into the Fund, and they are the entities designated to receive the largest percentage share of any remainder funds transferred from the Fund to the Marcellus Legacy Fund. 58 Pa.C.S. §§ 2314 & 2315. The overarching legislative purpose of assuring that counties and municipalities will be able to rectify the adverse consequences of unconventional drilling activities within their communities is further evidenced by the fact that the General Assembly specifically restricted the use of these funds to "purposes associated with natural gas production from unconventional gas wells," 58 Pa.C.S. § 2314(g), thereby safeguarding against their depletion for unrelated purposes.

Consequently, given the evident intent of the legislature that the impact fee provide an adequate and stable source of revenue for counties and municipalities to offset the adverse effects of unconventional gas well production, which, as the PUC highlights, are omnipresent and do not vary with the fluctuations in well production, *see* PUC Brief at 19-20, a construction which best effectuates this purpose is favored. Thus, an interpretation of "any calendar month" in the definition of a stripper well, as incorporated into the definition of "vertical gas well," to mean "each and every" calendar month during the reporting year is most consonant with this purpose, as it relieves producers of the obligation to pay the fee only if their well or wells produce 90,000 cubic feet per day or

less of natural gas for each and every calendar month of the year.[23]  As the PUC argues, this will result in more producers paying the impact fee — exactly what the General Assembly intended.  *See generally* PUC Brief at 26 (characterizing the overall legislative intent in enacting the stripper well provisions of Act 13 as "to capture more wells and fees").

Second, this construction is consistent with the overall legislative design of the provisions of Act 13 governing when other types of unconventional gas wells, namely, "nonproducing unconventional gas wells" and "restimulated unconventional gas wells," are subject to assessment of an impact fee.[24]  As we have previously emphasized, "[w]hen construing one section of a statute, courts must read that section not by itself, but with reference to, and in light of, the other sections."  *Trust Under Agreement of Taylor,* 164 A.3d at 1155.  Stated another way, "[s]tatutory language must be read in context, 'together and in conjunction' with the remaining statutory language."  *Id*; *see also* 1 Pa.C.S. § 1922(2) (presuming that the "General Assembly intends the entire statute to be effective and certain.").  Thus, we must read all of the impact fee assessment provisions

---

[23] This phraseology follows the manner in which the PUC has framed its argument:  that, to be exempt from the impact fee, a well must qualify as a stripper well for each and every month of the reporting year.  Of course, given the dual nature of the definitions at issue, the converse of this proposition is also true:  a well is not a stripper well, and thus not exempt from the impact fee, if it produces more than 90,000 cubic feet per day for even one calendar month of the year.

[24]  The parties are correct that the Commonwealth Court erroneously interpreted Act 13 in finding that a restimulated natural gas well is subject to a different type of impact fee than that imposed on other unconventional wells.  Quite plainly, Act 13 imposes no separate and unique "restimulated unconventional gas well fee," nor does it authorize the imposition of a separate and unique "nonproducing unconventional gas well fee."  Rather, Section 2301 defines only one type of fee which is assessed under Act 13.  *See* 58 Pa.C.S. § 2301 (defining "fee" as "[t]he unconventional gas well fee imposed under Section 2302 (relating to unconventional gas well fee); *see also* House Legislative Journal 206 (Feb. 8, 2012) (Remarks of Representative Ellis, a cosponsor of Act 13) (explaining that a restimulated well is subject to the same impact fee as other unconventional wells based on the 90,000 cubic foot a day production level).

set forth in Section 2302 in conjunction with one another and strive to give effect to all of them. *Allegheny Sportsmen's League v. Rendell*, 860 A.2d 10, 18 (Pa. 2004).

Section 2302(b.1), governing "nonproducing unconventional gas wells," provides that if a well which has begun paying the impact fee is capped, or "does not produce natural gas in quantities greater than that of a stripper well within two years after paying the initial fee, then the fee shall be suspended." 58 Pa.C.S. § 2302(b.1). However, it also specifies that "[t]he fee shall be reinstated for a calendar year during which the unconventional gas well produces natural gas in quantities greater than that of a stripper well." *Id.* § 2302(b.1)(1). Thus, this statutory language, and the use of the phrase "during which," mandates payment of the impact fee for any nonproducing unconventional gas well whenever *at some point* during a calendar year it produces natural gas in quantities greater than a stripper well, which means, as discussed above, producing "more than 90,000 cubic feet of gas per day during any calendar month." Therefore, we interpret this section as establishing that a nonproducing unconventional well will meet this criteria, and thus be required to pay the impact fee, if it produces more than 90,000 cubic feet of gas per day at any point during the calendar year, even if it is only for one month. This supports a conclusion that the legislature intended that an impact fee is due and payable whenever any unconventional gas well produces more than 90,000 cubic feet per day of natural gas for even one month of a calendar year.

Likewise, the manner in which an impact fee is imposed for a restimulated unconventional gas well supports this construction. Section 2302(d),[25] setting forth the

---

[25] This statutory section provides:
    (d) **Restimulated unconventional gas wells**.--
        (1) An unconventional gas well which after restimulation qualifies as a stripper well shall not be subject to this subsection.

manner of calculating impact fees for such wells, provides that, if an unconventional gas well, which was drilled more than 10 years ago and was producing natural gas in a volume less than that of a stripper well, is restimulated[26] and, as a result, experiences a "substantial increase in production" — defined as "amounting to more than 90,000 cubic feet of gas per day during *a* calendar month"— it becomes subject to assessment of the impact fee. 58 Pa.C.S. § 2302(d)(2), (3) (emphasis added). Thus, under this provision, a restimulated unconventional gas well will be subject to the imposition of an impact fee whenever it exceeds 90,000 cubic feet a day of natural gas production for even a single calendar month. Our construction, therefore, renders all of the provisions of Act 13 governing the imposition of impact fees on various types of unconventional gas wells harmonious with one another.

Third, this construction is in accord with the PUC's interpretation of the relevant statutory language set forth in its prior administrative orders. *See* 1 Pa.C.S. § 1921(c)(8)

---

(2) The year in which the restimulation occurs shall be considered the first year of spudding for purposes of imposing the fee under this section if:

    (i) a producer restimulates a previously stimulated unconventional gas well following the tenth year after being spud by:

        (A) hydraulic fracture treatments;
        (B) using additional multilateral well bores;
        (C) drilling deeper into an unconventional formation; or
        (D) other techniques to expose more of the formation to the well bore; and

    (ii) the restimulation results in a substantial increase in production.

(3) As used in this subsection, the term "substantial increase in production" means an increase in production amounting to more than 90,000 cubic feet of gas per day during a calendar month.

58 Pa.C.S. § 2302(d).

[26] Restimulation may be achieved via the fracking process or the drilling of additional multilateral well bores from a single vertical well bore, as discussed *supra*.

(interpretations of statutory language by the administrative agency tasked with its implementation may be considered in construing its meaning). Herein, the PUC has faithfully adhered to its construction since it was first called upon in 2012 to interpret the impact fee provisions of Act 13 in response to inquiries and comments from natural gas producers.

In a Reconsideration Order issued in July 2012, disposing of a reconsideration petition filed by producers regarding the PUC's treatment of vertical gas wells in an Initial Tentative Implementation Order promulgated earlier that year, the PUC noted:

> [A] vertical gas well derives its status based on production levels. These production levels are determined per day during any calendar month. If a vertical gas well qualifies as such, via production levels, during any calendar month in a calendar year, that well will be subject to the impact fee.

PUC Reconsideration Order, 7/19/12, at 4.

Once more, in December 2012, the PUC again addressed the subject of when a vertical well is subject to assessment of an impact fee, this time in response to queries regarding a well that is "spud," or first drilled, in a particular calendar year, but later plugged during that same year. In a Clarification Order, the PUC stated:

> In the case of a vertical unconventional gas well, the fee is triggered and accrues at the moment the well meets minimum production criteria in a given calendar year. If a vertical well is later plugged during a year in which it had met that minimum production level, the fee is nonetheless payable since it had accrued *upon* that well meeting the production criteria set forth in Section 2301.

PUC Clarification Order, 12/20/12, at 9 (emphasis original).

Almost a year later, the PUC reiterated the same principle, yet again, in a Proposed Rulemaking Order:

> [V]ertical gas wells derive their status based on production levels. Those production levels are determined per day

during any calendar month. 58 Pa.C.S. § 2301. If a vertical gas well qualifies as a vertical gas well, via production levels, during any calendar month in a calendar year, that well will be subject to the impact fee. 58 Pa.C.S §§ 2301, 2392(f).

In order for the Commission to determine whether a vertical gas well is subject to the impact fee, producers must verify certain production information for the corresponding reporting year to the Commission to ensure that a particular well qualifies as a vertical gas well and is therefore subject to the fee. All vertical gas wells on the Department of Environmental Protection's (DEP) spud list as of December 31 of each year will be subject to the fee for that year unless the producer verifies to the Commission that a particular well did not produce natural gas in quantities greater than that of a stripper well during any calendar month in the reporting year. This means that even if a vertical gas well produces natural gas in quantities greater than that of a stripper well in only *one* month of a calendar year, that vertical well will be subject to the fee for that year. Producers must verify on their annual producer report forms filed with the Commission, by April 1 of each year, certain production level information for all vertical gas wells for which a fee is not due.

Proposed Rulemaking Order, 10/17/13, at 7-8 (emphasis original) (internal citations and footnotes omitted).[27]

Moreover, the PUC has advanced sound policy reasons supporting its interpretation which were accorded no weight by the Commonwealth Court.[28] The PUC concluded that, if a producer were able to avoid paying the impact fee for a vertical well based solely on one month during which its output fell to that of a stripper well, this would be an incentive for producers to manipulate a well's production to avoid payment of the

---

[27] Because these interpretations are long standing from the date of Act 13's enactment, February 14. 2012, we reject Appellees' assertion that they were developed in anticipation of litigation, and, hence entitled to no deference.

[28] To the concern raised by our learned colleague, Justice Wecht, that "[t]he only relevant policy-based concern entertained by a court engaging in statutory (as distinct from common law) construction is the policy evinced by the statute," Concurring Opinion (Wecht, J.) at 9, as we note below, our policy discussion is appropriately tethered to our legislature's allowance under the SCA to consider, *inter alia*, the consequences of a particular interpretation when construing a statute. *See* 1 Pa.C.S. § 1921(6).

impact fee. To be clear, there is no indication in the record that SBI engaged in this kind of behavior. Nonetheless, we defer to the PUC's judgment that, as a general matter, this is a legitimate administrative concern.

Indeed, the record in this matter furnishes support for the PUC's conclusion that varying a well's production is an ability its operator possesses. As acknowledged by SBI's Vice President, reductions in well output are within the operator's control, and they may occur as the result of something as benign as routine maintenance activities. N.T. ALJ Hearing, 12/4/14, at 84. Consequently, the PUC's interpretation ensures stability in the impact fee assessment process. The contrary interpretation advanced by Appellees would lead to an unreasonable result, as it would permit well operators who have enjoyed robust production from their wells for the majority of a calendar year to avoid paying the impact fees to the municipalities merely because of the happenstance of one month's diminished production. *See* 1 Pa.C.S. § 1921(6) (the consequences of a particular interpretation may be considered in any statutory construction analysis); 1 Pa.C.S. § 1922(1) (the legislature "does not intend a result that is absurd, impossible of execution or unreasonable."). Moreover, such an interpretation would impermissibly favor the private financial interests of producers over the public interest of counties and municipalities in having sufficient fiscal capabilities to protect their residents from the deleterious effects of unconventional drilling activities. This would contravene the SCA's presumption that the intent of the General Assembly in enacting legislation is "to favor the public interest as against any private interest." *Vitac Corporation v. W.C.A.B. (Rozanc)*, 854 A.2d 481, 485 (Pa. 2004) (quoting 1 Pa.C.S. § 1922(5)). It was, therefore, error for the Commonwealth Court to summarily disregard the PUC's interpretation. *See Alpha Auto Sales v. Department of State*, 644 A.2d 153, 155 (Pa. 1994) (holding that because the administrative agency had rendered "a sensible construction of the statute in question

supported by cogent policy considerations," it was error for the Commonwealth Court to ignore it).

In conclusion, for all of the aforementioned reasons, we hold that, under Act 13, an unconventional vertical well is a "vertical gas well" subject to assessment of an impact fee for a calendar year whenever that well's natural gas production exceeds 90,000 cubic feet per day in at least one calendar month of that year. Because it is undisputed that the wells at issue in this case met this criteria, we reverse the order of the Commonwealth Court which set aside the PUC's assessment to SBI of impact fees for the 2011 and 2012 reporting years.

Order reversed. Jurisdiction relinquished.[29]

Chief Justice Saylor and Justices Donohue and Dougherty join the opinion.

Justice Wecht files a concurring opinion in which Justice Baer joins.

Justice Mundy files a dissenting opinion.

---

[29] PIOGA has filed a motion with our Court requesting that we strike portions of the PUC's reply brief, which it contends are merely the PUC's repetition of the arguments made in its initial brief regarding why the impact fee provisions are not a tax, and, thus, are in violation of Pa.R.A.P. 2113(a). PIOGA also seeks leave to file a proffered *sur-reply* brief addressing two matters: First, PIOGA desires to respond to an argument the PUC made in its reply brief pertaining to public comments it solicited from interested parties, such as producers and municipalities, regarding the definition of stripper well, which the PUC argued in its reply brief supported its interpretation. PIOGA contends that these comments did not address the meaning of the term "any" in the stripper well definition, and, hence, are irrelevant for interpretative purposes. Second, PIOGA seeks to respond to the PUC's contention that it would be "laborious and expensive," PUC Reply Brief at 12, to investigate each unconventional well to see if it was incapable of producing 90,000 cubic feet a day, an assertion it claims is unsupported by the record. We grant PIOGA's motion with respect to both matters.